[Crim. No. 2625.   In Bank.—April 10, 1924.]

# THE PEOPLE, Respondent, v. A. F. CHAMPION, Appellant.

[1] CRIMINAL LAW—MURDER—ARREST OF DEFENDANT'S WITNESSES—EFFECT UPON JURORS—MISCONDUCT—EVIDENCE.—In a prosecution for murder, the fact that some of the jurors sitting upon the trial of the case happened to be in the vicinity of the arrest of certain of defendant's witnesses upon the charge of perjury, which arrest was secured by the district attorney and made outside of the courtroom in the courthouse and not in the presence of the jury while it was still assembled as a body in the active operation of the trial of the case, will not suffice as a foundation for a charge of misconduct against the district attorney upon the theory that he was endeavoring to improperly influence the jurors in the case, there being no showing that the jurors standing in the corridor heard the conversation between the arresting officer and the witnesses, nor any showing that the arrest was knowingly made in the presence of the jurors for the purpose of influencing them adversely to defendant's case and his witnesses, nor any contention that the arrest was not rightfully made.

[2] ID.—CHARGE OF SIGNALING TO WITNESS—ALLEGED MISCONDUCT OF DISTRICT ATTORNEY—GOOD FAITH.—In such a prosecution, misconduct by the district attorney cannot be successfully predicated upon the fact that he charged a witness for the defense, who was a spectator in the courtroom, with having signaled another witness for the defense who was upon the witness-stand testifying, where the district attorney believed in the utmost good faith that the former witness had been guilty of signaling, even though he failed to fully substantiate his claim.

[3] ID.—EVIDENCE—IMPEACHMENT.—In such a prosecution, the trial court did not err in sustaining the objection of the prosecution to the defendant's attempt to read in evidence the affidavit of a witness for the defense used upon extradition proceedings, nor did the court err in refusing to permit the defense to read in evidence the transcript of the testimony given by said witness at the preliminary examination of the defendant, where the entire testimony of this witness, as given upon the trial of the instant case, was confined to statements made in response to questions propounded by the defense, which were substantially that he did not know or could not remember anything concerning the making and signing of the affidavit used for extradition purposes and that he did not know whether or not he had testified at the preliminary examination of the defendant; and, therefore, under these circumstances, neither the affidavit nor the transcript in

question could be resorted to for impeachment purposes as provided in sections 2049 and 2052 of the Code of Civil Procedure.

[4] ID. — REOPENING OF CASE — EVIDENCE — IMPEACHMENT. — In such prosecution, there was no error in the ruling of the trial court permitting the reopening of the case during the closing argument of the district attorney in order to permit the introduction in evidence of the testimony of a medical expert, where it is shown that the objection to the reopening of the case for such purpose was expressly waived by the defense; but it was error to admit, over the objection of the defense, the testimony of such expert to the effect that a witness who had testified for the defense possessed a weak and uncertain memory, such error, however, not being harmful to the defendant in view of the fact that said defense witness had not testified to a single fact material to any issue in the case.

[5] ID. — WITNESS AFFECTED BY MENTAL DISEASE—IMPEACHMENT — MANNER OF.—A witness not affected by mental disease or mental derangement may be impeached only in the manner and for the reasons provided in sections 2051 and 2052 of the Code of Civil Procedure. His testimony may not be impaired by the opinion of other witnesses that he is afflicted with a weak memory; that fact, if it be a fact, may and perhaps must be done by cross-examination.

[6] ID.—EVIDENCE — ATTORNEY AND CLIENT — PRIVILEGED COMMUNICATIONS.—In such prosecution, conceding, without deciding, that it was error to require a witness for the prosecution and an attorney at law to testify against the defendant that he had delivered a gun to the defendant a short time before the homicide in question, still the error, if any, was without prejudice to the defendant, where the material thing to know was that the defendant did have a gun and that he used it to kill the deceased, which fact was testified to and established by three eye-witnesses; and moreover, the fact that the defendant had received the gun from his former attorney was already in evidence as an independent piece of evidence in the form of a declaration made by the defendant.

[7] ID.—CORPUS DELICTI—INSTRUCTIONS.—In such prosecution, the refusal of the trial court to give an instruction requested by the defense to the effect that the burden was upon the prosecution to prove the *corpus delicti* was not error, inasmuch as the court gave another instruction at the request of the defendant which was substantially the same as the refused instruction, and also gave full and complete instructions at the request of the people upon the subject of *corpus delicti*.

[8] ID.—ALIBI—INSTRUCTIONS.—In such prosecution, an instruction relating to the measure of proof required for the establishment of an alibi, which was defendant's defense, should not have been re-

quested by the district attorney and should not have been given by the trial court as it contained an erroneous statement of the law, but when such instruction is read in conjunction with two instructions immediately following it which clearly and correctly stated the law relative to the degree of proof required to establish the defense of alibi, it cannot be said that the jury was not fully informed of the law which covered and controlled the defendant's defense of an alibi. (On rehearing.)

APPEAL from a judgment of the Superior Court of Los Angeles County. Carlos S. Hardy, Judge. Affirmed.

The facts are stated in the opinion of the court.

S. S. Hahn for Appellant.

U. S. Webb, Attorney-General, and Erwin W. Widney, Deputy Attorney-General, for Respondent.

LENNON, J.—This is an appeal from a final judgment of conviction, carrying with it the death penalty, following and based upon a verdict of a jury finding the defendant guilty of the crime of murder in the first degree. Three eye-witnesses to the homicide testified in detail and without material variation to the killing of the deceased, and each positively identified the defendant as the person who shot the deceased.

The story of the homicide so narrated is as follows: On the evening of January 10, 1922, a crap game was in progress in a room in an apartment house located at 309 West Ninth Street, in the city of Los Angeles, in which a number of persons were participating. The party included Goldy, the deceased; Champion, the defendant; Doyle, Sidenstricker, Smith, a girl who was merely an onlooker, and Reebs, who joined the game about a half an hour after it started. The defendant Champion and the deceased Goldy were winning all the money. Champion kept urging Goldy to play for higher stakes, but Goldy refused, saying that he did not know enough about the game to play for big stakes. Champion got up from the floor where the dice were being rolled, walked over to a little table and took from a newspaper wrapping a revolver which he loaded with cartridges which he took from his

pocket. The deceased asked him, "What is the idea of all the firearms, Slim?" to which the defendant replied, "Someone is getting too lucky." A few more passes were made with the dice when the defendant threw a bunch of bills on the floor, saying, "Fade it," or words to that effect. Goldy refused to shoot for more than $10 of it. Without a word Champion rose from his chair and, taking a step toward the deceased, shot him through the shoulder just as the deceased started to rise from his chair. The defendant was standing not farther than a foot and a half or two feet from the deceased, and the bullet, taking a downward course, plowed through his chest and abdomen. He pitched forward on his face. The defendant then declared that the first one who moved would get the other bullet, and, turning toward Doyle, said, "Doyle, if you move, I will blow your head off." The defendant turned and kicked the deceased and then, pressing his gun to the deceased's forehead, proceeded to rifle his pockets. He started to see how badly the deceased was injured, but desisted, telling Doyle to look at him and see. Upon Doyle saying that the deceased was shot in the shoulder the defendant said, "I guess I had better get out of here," and immediately left by the back door.

This is the story of the shooting as testified to by Doyle, and it is corroborated in detail by the testimony of other witnesses for the prosecution, who were also participants in the crap game. All of the eye-witnesses to the killing testified that the deceased was not armed; that there had been no quarrel of any kind between the deceased and the defendant, and that there was no conduct on the part of the deceased which might have warranted or justified the shooting of the deceased by the defendant. The deceased was taken to the Clara Barton Hospital. He was accompanied there by four of the participants in the crap game. The deceased was dead when they left the hospital a half an hour later. The defendant was arrested and returned to Los Angeles upon extradition proceedings from Cleveland, Ohio. At the trial of the case the defendant interposed the defense of an alibi, claiming that he was in Fort Worth, Texas, on the day of the shooting. He produced three witnesses—his father, his mother, and his cousin—in support of his defense. Evidently the jury disbelieved the testi-

mony of the alibi witnesses and accepted the testimony
of the prosecution's three witnesses, who testified that they
were eye-witnesses to the shooting and saw the defendant
kill the deceased.

No contention is made and, indeed, none could success-
fully be made, that the evidence as a whole is insufficient
to support the verdict and judgment. It is contended,
however, among other things, in support of the appeal, that
the district attorney was guilty of misconduct during the
course of the trial in (1) that he sought and secured the
arrest of certain witnesses for the defense upon a charge
of perjury in the presence of the jury, and (2) that he
wrongfully charged a witness for the defense, who was a
spectator in the courtroom, with having signaled another
witness for the defense who was then upon the witness-
stand testifying.

[1] The record does not show that the arrest of the
witnesses referred to was made in the presence of the jury.
In this behalf the showing is that the court had adjourned;
that the spectators were leaving the courtroom when the
arrest was made, and that the witnesses in question were
arrested outside of the courtroom in the corridor of the
courthouse and not in the presence of the jury while it was
still assembled as a body in the active operation of the trial
of the case. True, there is in the record affidavits, one
from a juror and one from a spectator, presented in sup-
port of a motion for a new trial, which aver, in substance,
that the affiants were present in the corridor of the court-
house when the witnesses in question were arrested by the
deputy sheriff. It does not appear, however, from the
affidavit of the juror that she heard the officer say that the
witnesses were being arrested upon a charge of perjury,
and conceding, as the affidavit of a spectator avers, that
the arrest and the statement that the arrest was made upon
the charge of perjury, were made in the presence of some of
the jurors, still it does not necessarily follow that the
jurors heard the deputy sheriff assert the cause of the
arrest. In any event, there is no affirmative showing that
the jurors standing in the corridor heard the conversation
between the deputy sheriff and the witnesses. That the
juror who made the affidavit did not hear such conversation
is evidenced by the fact that her affidavit makes no mention

of the cause of the arrest, nor does it say or purport to say that she heard the deputy sheriff say that the arrest was being made upon a charge of perjury. Moreover, there is no showing, either affirmatively or by implication from the facts contained in the affidavits offered in support of the motion for a new trial, that the arrest of the witnesses was knowingly made in the presence of the jurors as they were leaving the courtroom for the purpose of influencing the jurors adversely to the case of the defendant and the defendant's witnesses. There is no contention made that the arrest was not rightfully made. The arrest had to be made somewhere and it was proper to make it outside of the courtroom. The fact that some of the jurors sitting upon the trial of the case happened to be in the vicinity of the arrest will not suffice as a foundation for a charge of misconduct against the district attorney upon the theory that he was endeavoring to improperly influence the jurors in the case.

[2] It is evident from the record that the district attorney believed in the utmost good faith that Mrs. Hughes, one of the alibi witnesses for the defense, had been guilty of signaling to Mrs. Champion, another witness for the defense, while the latter was upon the stand testifying Immediately after Mrs. Champion retired from the witness-stand the district attorney called Mrs. Hughes to the stand and asked her, "It is a fact, is it not, a moment ago just preceding the time that I jumped up that you were shaking your head to the witness upon the stand." The witness denied that she had been communicating with the witness upon the stand and explained that she had been talking to her other aunt, who was likewise a spectator. She did not positively deny, however, that she had shaken her head. What she did deny was that she had any intention of mak-. ing any impression upon the witness who was upon the stand, and this was shown by her answer. The district attorney having asked her if she had not been looking at the witness on the stand at the time she was shaking her head, her reply was, "Well, if I was, I didn't know it. Certainly I didn't intend to have any impression on her." In the interest of justice, the district attorney was entitled to an explanation of the conduct of the witness sitting in the courtroom, and if as the district attorney evidently believed the witness was attempting to communicate with a witness

testifying upon the stand he was not required to sit passive and permit such communication. Having acted in good faith, he cannot be charged with misconduct, even though he failed to fully substantiate the claim that the witness sitting in the courtroom was willfully signaling to the witness upon the stand.

[3] The court did not err in sustaining the objection of the prosecution to the defendant's attempt to read in evidence the affidavit of a witness for the defense, one Harry A. Smith (referred to in the record as Harry A. Smith No. 1) used upon extradition proceedings, nor did the court err in refusing to permit the defense to read in evidence the transcript of the testimony given by said witness at the preliminary examination of the defendant. The entire testimony of this witness, as given upon the trial of the instant case, was confined to statements made in response to questions propounded by the defense, which were substantially that he did not know or could not remember anything concerning the making and signing of the affidavit used for extradition purposes and that he did not know whether or not he had testified at the preliminary examination of the defendant. Nothing material or immaterial, favorable or unfavorable, to the defendant's case was elicited from the witness. In short, it may be said that he utterly failed to testify to anything at all. Therefore, neither the affidavit nor the transcript in question could be resorted to for impeachment purposes as provided in sections 2049 and 2052 of the Code of Civil Procedure. (*People* v. *Creeks,* 141 Cal. 529, 532 [75 Pac. 101]; *People* v. *Cook,* 148 Cal. 334 [83 Pac. 43]; *People* v. *Spencer,* 58 Cal. App. 197, 225 [208 Pac. 380].)

[4] There was no error in the ruling of the court permitting the reopening of the case during the closing argument of the district attorney in order to permit the introduction in evidence of the testimony of Dr. Parkin, a medical expert. The record shows that the objection to the reopening of the case for the purpose of permitting Dr. Parkin to testify was expressly waived by the defense.

It was error, however, for the trial court to admit, over the objection of the defense, the testimony of Dr. Parkin. Apparently it was the theory of the trial court that the testimony of the witness was admissible for the purpose of assailing the credibility of the witness Harry A. Smith

No. 1. This was the announced purpose of the district attorney. The testimony of Dr. Parkin was to the effect that the witness was not insane at the time he was called to the witness-stand, and the major portion of the doctor's testimony tended to show no more than that the witness was possessed of a weak and uncertain memory. [5] A witness not affected by mental disease or mental derangement may be impeached only in the manner and for the reasons provided in sections 2051 and 2052 of the Code of Civil Procedure. (*People* v. *Harrison*, 18 Cal. App. 288, 296 [123 Pac. 200].) His testimony may not be impaired by the opinion of other witnesses that he is afflicted with a weak memory. That fact, if it be a fact, may and perhaps must be done by cross-examination. (*Ah Tong* v. *Earle Fruit Co.*, 112 Cal. 679, 682 [45 Pac. 7].) Conceding the error in this behalf the defendant could not have been prejudiced thereby because the witness Harry A. Smith No. 1, as previously indicated herein, had not testified to a single fact material to any issue in the case. Therefore, Dr. Parkin's testimony as to the weakened and uncertain memory of the witness could not have harmed the defendant.

[6] Conceding, without deciding, that it was error to require Hale Day, a witness for the prosecution and an attorney at law, to testify against the defendant, still the error, if any, was without prejudice to the defendant. It is doubtful whether the fact that Day was the attorney for the defendant at the time in question was sufficiently shown in evidence. In one breath he said that he was the attorney for the defendant at that time and in the next breath he said that he was not. In such a situation there was a conflict in the evidence as to the fact of the existence of the relationship, and therefore the ruling of the trial court made at one stage of the case as to the nonexistence of the relationship might well have been placed upon that ground. Day was called as a witness for the prosecution after one of the witnesses for the prosecution had already testified that upon the afternoon of the homicide the defendant had told him that he had just "brought" his gun from his attorney, Day, who had been minding it for him while he was in San Francisco. Day was called to the stand and compelled to testify that he had delivered the gun to the defendant, Champion, the last time he had seen him, which was shortly before the homicide. The question of

where the defendant got the gun was not an essential link in the prosecution's chain of evidence. The material thing to know was that he did have a gun and that he used it to kill the deceased. This was testified to and established by three eye-witnesses. Moreover, the fact that the defendant had received the gun from his former attorney was already in evidence as an independent piece of evidence in the form of a declaration made by the defendant. (Code Civ. Proc., sec. 1870, subd. 2.) The testimony of the witness Day that he had delivered the gun to the defendant a short time before the homicide in question was not, therefore prejudicial to the defense and will not suffice to warrant a reversal of the judgment.

Complaint is made of the trial court's refusal to permit Officer Cline, a witness for the prosecution, to testify as to whether or not he had seen Harry A. Smith No. 1 at the Clara Barton Hospital on the night of the murder. This is not a closely balanced case on the evidence, and the value of the evidence sought to be elicited from Officer Cline was so slight and inconsequential that we have no doubt but that the verdict would have been the same had the witness been required to testify in response to the quesion put to him.

[7] The refusal of the court to give an instruction requested by the defense to the effect that the burden was upon the prosecution to prove the *corpus delicti* was not error, inasmuch as the record shows that the court did give another instruction at the request of the defendant which was substantially the same as that requested which was refused. Furthermore, the trial court gave full and complete instructions at the request of the people upon the subject of *corpus delicti.* The trial court did not, therefore, err in refusing what was practically a duplicate instruction.

A reading of the entire record convinces us that there has been no miscarriage of justice.

Judgment affirmed.

Myers, J., Seawell, J., Lawlor, J., and Waste, J., concurred.

Rehearing denied.

In denying a rehearing the court filed the following opinion on May 10, 1924:

THE COURT.—In the petition for a rehearing in this case the point is urged for the first time that a certain instruction requested by the people and given by the trial court erroneously stated the rule relating to the measure of proof required for the establishment of an alibi, which was defendant's defense. No mention was made of this point in the original briefs presented in support of the appeal and, therefore, the point was not discussed in the opinion affirming the judgment. Ordinarily we pay no attention to points presented for the first time upon a petition for a rehearing, but in view of the fact that the judgment affirmed in this case involves the death penalty, we feel constrained to notice the point and say that the instruction complained of contained an erroneous statement of the law. [8] The instruction should not have been requested by the district attorney and should not have been given by the trial court. If that instruction had been permitted to stand alone it may well have constituted 'prejudicial error. The record, however, shows that immediately following the instruction complained of the trial court, at the request of the counsel for the defendant, gave two separate, particular, and pertinent instructions which clearly and correctly stated and reiterated the law relative to the degree of proof required to establish the defense of alibi and when the instruction complained of is read, as it must be, in conjunction with the two instructions immediately following it, it cannot be said that the jury was not fully informed of the law which covered and controlled the defendant's defense of an alibi. It was doubtless for that reason that the instruction now complained of in the petition for a rehearing was not complained of and commented on in the briefs filed upon the original hearing.

The rehearing is denied.