[Crim. No. 1009.   Third Appellate District.—January 24, 1928.]

THE PEOPLE, Respondent, v. FRED PLUM et al., Appellants.

Ray Manwell and W. E. Davies for Appellants.

U. S. Webb, Attorney-General, and J. Charles Jones, Deputy Attorney-General, for Respondent.

FINCH, P. J.—The information charges the defendants with the crime of "grand theft, committed as follows: The said Fred Plum and R. S. Christman on or about the twenty-ninth day of August, A. D. nineteen hundred and twenty-seven, at the county of Yuba, in the state of California, then and there being, did wilfully and unlawfully take, steal and carry away the property of one J. B. Dalby, consisting of five head of cattle, of the value of two hundred twenty dollars." Neither defendant demurred to the information and each of them entered a plea of not guilty. They were both convicted and sentenced to imprisonment in the state prison. This appeal is from the judgment and the order denying a new trial.

At the time of the alleged crime Christman, who is a veterinary surgeon, was meat inspector and health officer of the city of Marysville. Plum owned a meat market in Marysville and a slaughter-house near Ostrom station, about midway between Marysville and the town of Sheridan. J. B. Dalby was a farmer, residing near Sheridan.

August 19, 1927, Dalby called Christman to the farm to treat a sick cow. Christman "looked at the cow" and "said it was a bad case of tuberculosis and there could be nothing done for her." Dalby then requested Christman to test the other cattle on the place and on the following day Christman "injected the cattle with tuberculin, eleven head." He returned on August 23d and "said that out of the eleven there was nine that reacted." Dalby testified: "He advised us to sell the cattle and take a new start. I told him I would sell them to the Pleasant Grove butcher. . . . He said, 'If I was you, I would sell them to Fred

Plum. I am inspector. I will do the inspecting and see you get a square deal. . . . If you sell the cattle anywhere else there will be chances of loss.' I said, . . . 'I don't want anything to do with Fred Plum. . . . I sold him beef cattle and he owes me thirty or forty dollars that he has owed the last six or eight years.' He says, 'There is plenty of money behind the business now and you are safe in selling the cattle there.' . . . I says, 'All right. If that is the case, Fred Plum can have the cattle.'" August 25th Christman again went to the farm and there branded the nine head of cattle with the letter "T" on the left jaw. At that time he gave Dalby a written estimate of the weights of the condemned cattle and stated that they should bring one cent a pound below the San Francisco market. On August 27th Plum appeared at the farm and purchased seven head of the cattle at the estimated weights and price suggested by Christman. He gave Dalby a check for $50, on the back of which was indorsed, "Subject to inspection. Balance to be paid after cattle are inspected and passed." Later, on the same day, six of the cattle were taken to Plum's slaughter-house. The seventh one was taken August 29th, about the middle of the afternoon. Dalby testified that he saw the six head of cattle in Plum's corral at the slaughter-house a "little after" noon on Monday, August 29th; that on August 31st he saw Christman in Marysville, who stated that he had inspected two of the cattle, two calves; that they "passed all right," and that he "would go down that Wednesday evening and inspect the balance and notify us by mail on September 1st as to the result of the inspection"; and that on September 3d he received a letter from Christman reading as follows:

"Dr. R. S. Christman, D. V. M.                    Phone 334.
        "Office of
        "City Health Officer
        "City Hall,
            "Marysville, California, September 2nd, 1927.
"Mr. J. B. Dalby,
    "Sheridan, California.
"Dear Sir:
    "The first of the month has kept me exceedingly busy, hence the delay in my promised note to you, but will, say I regret very much the fact that I had no alternative other

than to condemn all of the cattle delivered by you to Mr. Plum's slaughter house, excepting the first two veal slaughtered.

"Out of my seven years experience as a Meat Inspector I have never encountered such a virulent type of tuberculosis. They were lesionized throughout, which means generalization.

"Yours very truly,
"CITY OF MARYSVILLE,
"R. S. CHRISTMAN,
"Meat Inspector."

Clarence J. Dalby, a son of the witness last mentioned, gave testimony to the same effect as that stated.

Lester Mitchell testified that he had been "following the trade of butcher" for about twenty years; that he had worked for two years under federal inspection and two years under state inspection; that he had charge of Plum's slaughter-house from August 10th to the latter part of September; that during that time he lived at the slaughterhouse with his family; that he butchered all of the Dalby cattle on August 30th and put the carcasses in the ice-box, hanging them separately in accordance with instructions given him by Plum; that he is "acquainted with the signs of tuberculosis in cattle, that is, butchered stuff"; that there were no signs of tuberculosis in the carcasses of the Dalby cattle; that he saw Plum in Marysville during the evening of the same day, at which time Plum "asked me how the cattle butchered out, the Dalby cattle. I said all right. He said they were reactors. I said no, they were all right. . . . He said, 'Don't you see what I mean? They are reactors. They are supposed to go down.' And I said, 'You can't get away with those calves,' and he says, 'Maybe I can't get away with the calves, but the other five are supposed to go down' "; that Plum there stated "that the cattle were to be sold and the Dalbys to be told they were destroyed"; that the witness sold the carcasses on Plum's instructions on September 1st, some of them in Sacramento and some in Roseville; that in the evening of that day he delivered to Plum "the receipts, or tags, for the weight and price that I had sold to the different shops"; that Plum said, "It is too much to split with Dr. Christman"; that Plum then "deducted from eight to fifteen

dollars a head off of that'' and said, ''That looks better now. It is too much money for Mr. Christman to split''; that three or four days later ''Plum came out with Dr. Christman'' and ''Plum called me off to one side and whispered to me that Dalby was making an investigation of his cattle and if he came there and asked me if I tanked them to tell him yes''; that on August 31st Christman appeared at the slaughter-house and stamped the carcasses of the Dalby cattle, ''Marysville Health Department. Inspected and passed,'' stamped them '' with seven stamps on each side''; that at that time Christman ''asked me, . . . 'Are these the Dalby cattle?' . . . I said, 'Yes'''; and that there were no ''cattle tanked or destroyed'' during the time he was working for Plum.

The defendants and their witnesses gave testimony to the effect that the cattle in controversy were butchered by Mitchell on Sunday, August 28th; that the carcasses were inspected and condemned by Christman on the following day, at which time he cut them down, ''sliced them across'' and poured coal-oil over them to make them unfit for human food; and that they were then placed in the steam tank and cooked, the tallow then being drawn off and the meat fed to the hogs. There is other testimony corroborating or discrediting the testimony of one side or the other. Enough has been stated to show that the evidence is substantially conflicting on every contested issue.

■ Appellants contend that under the provisions of section 484 of the Penal Code theft ''may be committed in four different ways''; that the information charges ''theft by asportation'' and that ''the crime proved is that of obtaining property under false pretenses, which, under section 484 . . . is the third method, or mode . . . of committing theft.'' Section 484 was amended at the last session of the legislature (Stats. 1927, p. 1046, sec. 1), for the purpose of avoiding such contentions as appellants make. In so far as applicable to the facts of this case it reads as follows:

''Every person who shall feloniously steal, take, carry, lead, or drive away the personal property of another, or who shall fraudulently appropriate property which has been entrusted to him, or shall knowingly and designedly, by any false or fraudulent representation or pretense, defraud

any other person of money, labor, or real or personal property, or who causes or procures others to report falsely of his wealth or mercantile character and by thus imposing upon any person, obtains credit and thereby fraudulently gets or obtains possession of money or property or obtains the labor or service of another, is guilty of theft.''

At the same session section 952 was amended (Stats. 1927, p. 1043) to provide: ''In charging theft it shall be sufficient to allege that the defendant unlawfully took the property of another.'' If the words ''steal and carry away'' were omitted from the information it would be in the precise form prescribed by the statute. It is not perceived that the ·defendants have suffered any possible prejudice from the use of those words in the charge and they may be treated as surplusage. Under similar provisions of the statutes of Massachusetts it is said that the effect ''is to put it beyond a doubt that the former crimes of larceny, embezzlement, and the obtaining of property by false pretenses, are now merged into the one crime of larceny. . . . This legislation was intended to do away with the possibility of a criminal indicted for one of the three crimes mentioned escaping punishment by reason of its being afterwards found that his crime was technically one of the other two mentioned. A typical case of this kind is *Commonwealth v. O'Malley,* 97 Mass. 584. In that case the defendant had obtained by a trick possession of the money of an ignorant woman for a temporary purpose, and had fraudulently converted it to his own use. He had been prosecuted for larceny, but had obtained an acquittal because the judge before whom he was tried believed his crime to have been embezzlement. He was then indicted for embezzlement, and was convicted. But it was held by this court that his offense was really larceny and not embezzlement, and he was thus enabled wholly to escape punishment. It was the object of the legislature to prevent for the future similar scandals in the administration of justice, by doing away with the merely technical difference between three cognate and similar offenses. The only way in which this reformatory intent can be effectuated is to allow the jury, upon the material facts which are the ground of a charge of larceny, to consider whether these facts show a taking of money or other property, by trespass from the possession of its owner,

a fraudulent conversion of it while properly in the possession of the wrongdoer, or an obtaining of it by criminal false pretenses, . . . and in either of these cases to convict of the larceny." (*Commonwealth* v. *King*, 202 Mass. 379, 388 [88 N. E. 454].) ■ Adapting the language of the King case, the effect of section 484 of the Penal Code is that the former crimes of larceny, embezzlement, and obtaining property by false pretenses are merged into the one crime of theft. A statutory form of charging such crime of larceny, substantially as provided by section 952, was upheld in *Commonwealth* v. *Farmer*, 218 Mass. 507 [106 N. E. 150], and *Commonwealth* v. *Carver*, 224 Mass. 42 [112 N. E. 481]. In the Farmer case, where the defendants had obtained property by false representations, it is said: "The indictments in all counts followed the short forms set forth in the criminal pleading act, R. L., c. 218. The constitutionality of the statute in this respect has been sustained in several decisions. It now is unnecessary to do more than summarize the conclusions reached. The word 'steal' used in the indictment for larceny has become a term of art and includes the criminal taking of personal property either by larceny, embezzlement or false pretenses. . . . The provisions of R. L., c 218, par. 39, require a bill of particulars setting out adequate details where the indictment alone does not sufficiently inform the defendants, and this as matter of right." In *People* v. *Hanaw*, 107 Mich. 337 [65 N. W. 231], it is said: "We think that it is within the power of the legislature to prescribe the form of indictments, keeping in view the constitutional right asserted in this case; and where, as in embezzlement, a defendant has a right to have the charge made certain by examination or by bill of particulars, it cannot be said that he is not informed of the nature of the charge." (See, also, *Commonwealth* v. *Bennett*, 118 Mass. 443, 452; *Commonwealth* v. *Wakelin*, 230 Mass. 567 [120 N. E. 209], and *State* v. *Hodgson*, 66 Vt. 134 [28 Atl. 1089].) Sections 870 and 925 of the Penal Code require that the testimony in a criminal case taken at a preliminary examination or given before a grand jury be taken down by a stenographic reporter and, in the event of the commitment of the defendant for trial or his indictment, that he be furnished with a transcript thereof. Such transcript, together with the indictment or

information, certainly informs the defendant of the nature of the charge against him as fully as would a bill of particulars.

■ The defendants introduced in evidence ·Christman's official report as meat inspector for the month of August, showing that on August 29th he condemned as tubercular five beeves belonging to Plum. They also introduced, over the objection of the district attorney, a similar report for September, which showed that three of Plum's cattle were condemned September 14th, but none on any other day during that month. In admitting the latter report in evidence the court said: ''I don't think it is material.'' The statement of the court is correct. The witnesses for the defendants testified that the cattle in question were inspected by Christman on August 29th and those for the prosecution testified that they were inspected on August 31st. In either case the results of the inspection would naturally be contained in the August report and the report for September, therefore, was immaterial.

Plum testified that on August 30th he purchased a bull calf. It may be conceded that this testimony was material. The defendants then offered in evidence a bill of sale of the calf to Plum, but objection thereto was sustained. The alleged bill of sale was not made a part of the record. It does not appear when or by whom it was executed or what were the contents thereof. It cannot be determined on this appeal, therefore, whether the instrument was material.

The court instructed the jury in the language of section 484 of the Penal Code, defining the crime with which the defendants are charged. ''Ordinarily it is best to give an instruction in the language of the statute defining the crime.'' (8 Cal. Jur. 326.) ■ It was for the jury to determine from the facts proved whether the taking of the property was ''by trespass from the possession of its owner, a fraudulent conversion of it while in the possession of the wrongdoer, or an obtaining of it by criminal false pretenses.'' (*Commonwealth* v. *King, supra.*)

■ The appellants complain of the court's refusal to give four of their proposed instructions on the subject of conspiracy. Three of these proposed instructions are indorsed as refused because first proposed during or after the argument, a court rule requiring that proposed instructions

584

must be in the judge's hands prior to the argument. The instructions are framed on the erroneous theory that proof of a conspiracy was necessary to warrant a conviction of either defendant, and one of them expressly so states. The defendants were not on trial for conspiracy. Certain admissions and declarations made by Plum were proved as evidence of his guilt, but the court repeatedly instructed the jury, at Christman's request, that such admissions and declarations could not be considered as evidence against Christman. Under such circumstances it was not necessary to instruct the jury on the subject of conspiracy. The case is unlike that of *People* v. *Geiger,* 49 Cal. 643, 649, where it is said: "We think there was sufficient evidence of the conspiracy between Alexander and the defendant to justify the court in admitting in evidence the declarations of the former made previous to the alleged killing. The question of conspiracy was then submitted to the jury, with instruction to disregard the declarations of Alexander, unless the conspiracy was satisfactorily proved. This was the proper practice." (See, also, *People* v. *Fehrenbach,* 102 Cal. 394, 398 [36 Pac. 678], and *People* v. *Dixon,* 94 Cal. 255, 257 [29 Pac. 504].) The court instructed the jury fully, and as favorably to the defendants as the law warrants, on the law applicable to every element of the crime charged, including an instruction that "every single fact which is necessary for drawing the deduction of guilt must be proved by evidence which satisfies the mind and consciences of the jury to a moral certainty and beyond a reasonable doubt."

The usual contention is made that the district attorney was guilty of prejudicial misconduct in his argument to the jury. The remarks of which complaint is made are so clearly within the bounds of legitimate argument that it is deemed sufficient to so state.

At the hearing of their motion for a new trial the defendants read into the record and offered in evidence an affidavit in which the affiant stated: "That Viola M. Downing was one of the jurors who sat as a trial juror in the above entitled case; that on the 15th day of October, 1927, and after the said Viola M. Downing had been summoned as one of the jurors in the above entitled case, but before her examination, the said Viola M. Downing was present

at her place of business, 402½ D Street, Marysville, and in the presence of affiant said Viola M. Downing stated that if she was summoned to appear on said jury and if she was called, she would hang Fred Plum, one. of the defendants herein, because her mind was made up that Plum was guilty.'' The record does not show when the defendants first discovered the alleged bias of the juror, or whether testimony as to her qualifications was such as to show bias or to put the defendants upon further inquiry. The minutes of the trial show that the defendants did not exercise all of their peremptory challenges. Counsel for defendants stated that their own affidavit shows that they ''had no knowledge of such a state of facts,'' but they did not take any steps to make such affidavit a part of the record and it is not contained in the transcript on appeal. Under the circumstances stated, the affidavit quoted is wholly insufficient to show that the court erred in denying a new trial.

The judgment and the order are affirmed.

Hart, J., and Plummer, J., concurred.

A petition for a rehearing of this cause was denied by the district court of appeal on February 21, 1928, and the following opinion then rendered thereon:

FINCH, P. J.—In their petition for a rehearing the appellants, referring to the last sentence of section 952 of the Penal Code (Stats. 1927, p. 1043), quoted in the original opinion, say: ''The enactment, providing that the allegation of 'unlawfully took' shall be sufficient to charge all the acts constituting theft, . . . not only fails to allege the elements of the crime of theft, but alleges an act which might and ordinarily does not constitute a crime at all.'' ■ Section 952, however, must be read in connection with section 951, both enacted at the same session of the legislature. Section 951 provides:

''An indictment or information may be in substantially the following form: . . . The grand jury (or the district attorney) of the county of ————, hereby accuses A. B. of a felony (or misdemeanor), to-wit: (giving the name of the crime, as murder, burglary, etc.), in that on or about the ——— day of ————, 19—, in the county of ————, State

of California he (here insert statement of act or omission, as for example, 'murdered C. D.')''

The information in this case, the charging part of which is set out in the original opinion, is in substantial compliance with the prescribed form, and it is clear that "grand theft" always constitutes a crime. In an early case it was said: "Our criminal code was designed to work the same change in pleading and practice in criminal actions which is wrought by the Civil Code in civil actions. Both are fruits of the same progressive spirit which, in modern times, has endeavored at least to do away with the mere forms and technicalities of the common law which were productive of no good, and frequently brought the administration of justice into contempt by defeating its ends. Under the pretense of informing the defendant of the nature of the charge against which he was called upon to defend, it was necessary, at the ancient common law, to describe the means by which the homicide was committed, and the nature and extent of the wound and its precise locality; from which it necessarily followed that a trifling variance between the proof and the allegation frequently defeated a conviction, no matter how manifest the guilt of the defendant. It was a long time before legislators and judges discovered that this rule had nothing but the most flimsy pretext to support it. If the defendant is guilty, he stands in need of no information to be derived from a perusal of the indictment, as to the means used by him in committing the act or the manner in which it was done, for as to both his own knowledge is quite as reliable as any statements contained in the indictment. If he is not guilty, the information could not aid in the preparation of his defense." (*People* v. *King,* 27 Cal. 507, 510 [87 Am. Dec. 95; *People* v. *Cronin,* 34 Cal. 191, 200; *People* v. *Fowler,* 178 Cal. 657, 661 [174 Pac. 892].) From purely theoretical considerations it might be exceedingly important for the indictment or information to set forth the manner in which the alleged murder was committed and the means by which it was accomplished, thereby informing the defendant of the particular facts against which he will be required to defend at the trial. Theoretically, a defendant may learn during the progress of the trial, for the first time, that the prosecution relies for a conviction upon proof that the alleged murder was committed by means of

poisoned candy sent from a distant state, by some subtle process or means at or near the scene of the crime, or through an accomplice, but experience has demonstrated that, from a practical standpoint, the rule requiring an indictment or information to set forth such particulars has "nothing but the most flimsy pretext to support it," and it is now "the settled law of this state that it is sufficient to charge the offense of murder in the language of the statute defining it, whatever the circumstances of the particular case." (*People* v. *Witt*, 170 Cal. 104, 107 [148 Pac. 928].) There may be technical objections to the short form of indictment or information under discussion, but when a defendant charged with grand theft as defined by section 484, has been furnished a copy of all the testimony taken at the preliminary examination or given before the grand jury, a rule requiring the indictment or information to state more than is required by sections 951 and 952 would have "nothing but the most flimsy pretext to support it." The extreme technicalities of the old common law are no longer followed in the English practice. The English Larceny Act, 1916, provides for a short form of indictment in charging simple larceny and more particular averments in a charge of obtaining property by false pretenses. (Archbold's Criminal Pleading, Evidence & Practice, 25th ed., 491, 669.) "The distinction between larceny and obtaining by false pretenses is now little more than academic, because of the provisions of 6 & 7 Geo. 5, C. 50, s. 44, sub. ss. 3, 4." (Id. 507.) "On the trial of an indictment for stealing the jury may . . . find the defendant guilty of embezzlement or of fraudulent application or disposition, as the case may be. . . . If on the trial of any indictment for stealing it is proved that the defendant took any chattel, money, or valuable security in question in any such manner as would amount in law to obtaining it by false pretenses with intent to defraud, the jury may acquit the defendant of stealing and find him guilty of obtaining the chattel, money, or valuable security by false pretenses, and thereupon he shall be liable to be punished accordingly." (Id. 488.)

Appellants are in error in saying in the petition that the opinion filed herein "declares that the case below was erroneously tried upon the theory that a conspiracy existed between the defendants," the statement in the opinion being

that certain proposed instructions are framed on the erroneous theory therein stated. No further discussion of the matter appears to be necessary.

It is strenuously urged in the petition that the opinion incorrectly states that a remark of the trial court of which appellants complain referred to the September report of the defendant Christman. In support of their present contention, counsel cite pages 157 and 158 of the reporter's transcript, containing evidence relating to the August report. No statement of the trial court appears on either of those pages which has any semblance of an adverse comment, and on page 159 it clearly appears that the August report was admitted in evidence without objection. It is sufficient to call attention to pages 34 and 35 of appellants' opening brief, where counsel correctly set forth the court's statement of which they complain and the evidence in relation to the report referred to by the court, citing page 201 of the transcript. A perusal of that part of their brief or that page of the transcript will remove all possible doubt as to the report to which the court referred in the statement in question.

■ Appellants again complain of certain statements made by the district attorney in his argument to the jury and the comment of the court in relation thereto, appearing on page 358 of the transcript, as follows:

"If these defendants are not made to suffer the penalty of their crimes, what is the use of you and me teaching our sons and daughters it is better to be honest, if one guilty of such crimes are not made to pay the penalty of the law? The people of this community are awaiting with interest your verdict in this matter. Mr. Manwell: We object to that, intimating that the public are interested in the conviction of these men. Mr. Norby: There is your public. The Court: The People of the State of California are always interested in the conviction of every man if he is guilty. Mr. Manwell: But we object to his making that remark in the manner in which he made it. The Court: The objection is overruled."

Neither the remark of the court nor the statements of the district attorney were assigned as error, nor was the court requested to instruct the jury to disregard them. It does not appear that the rights of the defendants were prejudiced

by what was stated by either the district attorney or the court.

Counsel again urge that a new trial should have been granted on the ground of the alleged bias of the juror Viola M. Downing. It is a sufficient answer to cite *People* v. *Emmons,* 7 Cal. App. 685, 700 [95 Pac. 1032].

The learned trial judge was scrupulously fair and impartial in the trial of the case and there is nothing in the record to indicate a miscarriage of justice.

The petition for a rehearing is denied.

Hart, J., and Plummer, J., concurred.

A petition by appellants to have the cause heard in the supreme court, after judgment in the district court of appeal, was denied by the supreme court on March 22, 1928.

All the Justices present concurred.