[Crim. No. 3952. In Bank.—May 1, 1936.]

THE PEOPLE, Respondent, v. JOHN B. BERRYMAN, Appellant.

A. J. Harder for Appellant.

U. S. Webb, Attorney-General, and Ralph H. Cowing, Deputy Attorney-General, for Respondent.

CURTIS, J.—Defendant was convicted of murder of the first degree. The verdict of the jury was silent as to the punishment which the defendant should suffer as a result of his crime. The court as was its duty in pursuance of such a verdict, imposed the death penalty upon the defendant. He has appealed from the judgment and from the order denying a new trial.

From the evidence we gain but little knowledge of the defendant, John B. Berryman, before his appearance on July 8, 1935, in Wilton and Elk Grove, two small communities, situated near each other in Sacramento County, and some eight to ten miles from the city of Sacramento. At about 6 o'clock of the evening of that day he came with the deceased, John Grant, to the gasoline station and store of C. H. Edwards, situated about a half a mile south of the Seven Mile House, which is near the town of Wilton. The two came to the station in Grant's machine driven by the defendant. Grant ordered gasoline for his machine, and then went into the house of Edwards which was connected with the store. He was an old friend of the Edwards' family. While Grant was in the house, Edwards and the defendant engaged in conversation. The defendant asked for a sack of tobacco from Edwards' store, and told Edwards to charge it to Grant. The defendant claimed to have met Edwards before, which fact caused Edwards to scan Berryman's features very closely to determine whether he had ever met the defendant before. He concluded that he had never seen defendant before that evening. Grant thereafter came out of the house, took out his pocket book in plain view of defendant, displaying therein something between thirty and forty dollars. He paid for the gasoline and then he and defendant rode off together in Grant's machine. Edwards said Grant had been drinking and that when they left he was pretty sure the defendant was driving the machine. Evidently the two went from Edwards' place of business to Grant's house, which was located on a small farm near or in Wilton. Grant's house was set back from the main highway something less than a mile, and a private driveway or roadway led from the public highway to his house. Mrs. Grant was at home when they arrived. Both men entered the house, which was a small five room house. Grant complained of not feeling well and went into the bed-

room to take off his shoes, intending to lie down on the bed for a while. The defendant was in the kitchen and possibly in the bedroom during their short stay at Grant's house. Mrs. Grant conversed with him, and had every opportunity to acquaint herself with his physical appearance. He told Mrs. Grant he was to stay at their house for a few days and work as he needed money. While Grant was taking off his shoes, something was said about the battery of the radio, which had been taken to the shop for repair. Grant then changed his mind about going to bed, and put on his shoes, and told Mrs. Grant he was going after the battery. He and the defendant then left the Grant home in Grant's machine, defendant driving, evidently for the reason that Grant was slightly at least under the influence of liquor. Mrs. Grant testified that it was about 6:30 in the evening when her husband and the defendant visited the Grant home. The next we see of Grant was at Mack's Welding Works, where he had evidently gone to get the radio battery. A man was with him, but Mr. Mack was unable to identify him as the defendant. Grant and the defendant were next seen together at Baldwin's Radiator Shop just outside of the town of Wilton, where Grant brought his automobile to have the radiator fixed. Mr. Baldwin conversed with the defendant, and the latter claimed he had met Baldwin before, which caused the latter to observe closely the features of the defendant in order to determine when he had ever met the defendant before. Grant was still under the influence of liquor and took out his pocket book and displayed his money. Baldwin said he saw a twenty dollar bill and some small change in the pocket book as it was displayed by Grant. Grant and Berryman arrived at Baldwin's place between 6:30 and 7:00 o'clock of the same evening on which they had visited Grant's house. About one hour thereafter, or about 8 o'clock of that evening, Mrs. Grant saw her husband's automobile as someone drove it from the public highway on the private road leading to her house. After the machine had entered the driveway, it stopped. She saw a man get out of the machine, and after a few minutes' delay he re-entered the machine and drove away at a rapid rate of speed. Some fifteen minutes later, a couple of ladies, while driving along the road, discovered the dead body of Grant lying in the driveway at the point where Grant's automobile was seen to stop and then turn and leave on the public high-

way. Grant had been so badly beaten over the back of the head that he had died from the result of the wounds so inflicted. Grant's pockets were turned inside out and his money was gone. The next we see of the defendant was at the home of E. F. Poston at Elk Grove. He arrived there about 8 o'clock of the same evening, and offered Poston two dollars to take him to Sacramento. He said his wife was sick in the hospital in that city and he was in a hurry to get there. Poston agreed to take defendant to Sacramento, and the latter voluntarily raised the price of the trip from two dollars to two and one-half dollars. He was well supplied with money. A neighbor of Poston by the name of Martin Moritz rode with Poston and the defendant on their trip to Sacramento. Under the directions of the defendant they left him near the corner of L and Second Streets. He asked them into a beer parlor where they all had a drink or two. Poston left the defendant at the beer parlor and returned to his home where he heard the report of Grant's death. He immediately telephoned the sheriff of Sacramento County, and told him of taking Berryman from Elk Grove to the city of Sacramento. At the request of the sheriff, Poston went to Sacramento, and seeing defendant on Second Street between K and L close to the beer parlor where he had left him earlier in the evening, pointed him out to the deputy sheriff who accompanied him. On being arrested, the defendant denied he knew Grant or that he had been at his house or in Wilton or Elk Grove on that day or ever. Blood was found on his trousers, which the experts testified was human blood. Grant's machine was found parked about two hundred feet from Poston's house. After his arrest the defendant was placed on trial, and at the trial he failed to take the witness stand or to testify in the case.

No serious contention is made that the verdict is not supported by the evidence produced at the trial. Defendant claims, however, that on account of certain errors occurring during the progress of the trial he was so prejudiced before the jury that he was denied a fair trial. These alleged errors consist of statements made by the district attorney in his opening statement to the jury, which he subsequently did not prove, and statements made by the same officer in his argument to the jury, and the action of the court in reopening the case at the request of the district attorney for

the purpose of admitting in evidence a bottle containing a small amount of whiskey marked exhibit 5, which it was claimed bore the defendant's finger-prints.

In his opening statement to the jury the district attorney said among other things that the officers found blood on his (defendant's) trousers. "We will show that that was human blood. We will show you it has the same blood count as Mr. Grant's blood." On the trial of the case while the prosecution established the presence of human blood upon the trousers worn by the defendant on the day the deceased was killed, it failed to prove that the blood on the trousers was the blood of the deceased, as the district attorney claimed in his opening statement the prosecution would prove at the trial of the action. It is not contended that this statement of the district attorney was not made in good faith nor in the honest belief that the prosecution would be able to prove all that he claimed it would prove in his statement. But even if this claim were made, there is nothing in the record which would tend to support it. The question raised by the defendant has frequently been before this and the appellate courts of this state, and we are not cited to any instance where a contention like that made by appellant in the present case has been held to be reversible error. On the other hand the conclusion of the appellate courts is that such an overstatement reacts upon the party making it, rather than injuring the party against whom it was made. "It is the duty of counsel making an (opening) statement to state the facts fairly, and to refrain from stating facts which he cannot or will not be permitted to prove. Yet, the mere violation of the rule by a prosecuting attorney is not of itself evidence that he acted in bad faith, and reversible error. Usually such an overstatement reacts upon the party making it." (8 Cal. Jur. 260; *People* v. *Gleason,* 127 Cal. 323 [59 Pac. 592] ; *People* v. *Lewis,* 124 Cal. 551 [57 Pac. 470, 45 L. R. A. 783].)

The statements of the district attorney which the appellant contends constituted such serious misconduct on the part of said officer as to prejudice the substantial rights of the defendant were made during the argument of the district attorney to the jury as shown by the following excerpts from the reporter's transcript: "We have got to take a stand against the ease with which people throw over their regard for the rights of another, we have got to do it, and I want to

say to you Ladies and Gentlemen of the Jury that this whole county, this whole state is watching what you do today upon this case. Why, it is an awful thing. . . .

"Mr. Harder: To that statement, your honor, we assign as error on the part of the district attorney.

"The Court: The court will agree with you on that, Mr. Harder. I would direct counsel to refrain from that sort of argument; I think it is improper.

"Mr. Babcock: Very well, your Honor.

"The Court: . . . and the jury is instructed to disregard it.

"Mr. Babcock: I did that in good faith, that these punishments are meted out so that other people will know . . .

"The Court: Well, you went farther than that.

"Mr. Babcock: Very well, your Honor."

The general rule regarding misconduct of the district attorney which tends to and is likely to result in prejudice to the defendant is that where no objection is made to such misconduct by the defendant, or where objection is made and the court sustains the objection and properly admonishes the jury, the misconduct claimed to be prejudicial to defendant's rights will not furnish grounds sufficient to justify the granting of a new trial or the reversal of the judgment. (8 Cal. Jur., sec. 603, p. 623, and cases there cited.) There are two exceptions to this general rule. One is where the case is closely balanced and there is grave doubt of defendant's guilt, and the acts of misconduct are such as to contribute materially to the verdict, a miscarriage of justice results requiring a reversal. (*People* v. *Fleming*, 166 Cal. 357, 381 [136 Pac. 291, Ann. Cas. 1915B, 881].) The other exception is where the act done or remark made is of such a character that a harmful result cannot be obviated or cured by any retraction of counsel or instruction of the court. In such cases the misconduct will furnish ground for a reversal of the judgment, even where proper admonitions are given by the court. (*People* v. *MacDonald*, 167 Cal. 545, 551 [140 Pac. 256] ; *People* v. *Derwae*, 155 Cal. 592, 597 [102 Pac. 266].)

Appellant cannot possibly come within the first of these exceptions; that is, that the case against him is a close case and therefore the objectionable statement of the district attorney contributed materially to the verdict against him notwithstanding the admonition of the court to the jury to dis-

regard it. The evidence showed without a shadow of a doubt that the deceased Grant met his death as a result of the criminal act of someone, and points unerringly to the appellant as the perpetrator of the crime. In a case so overwhelmingly against the defendant, the objectionable remark of the district attorney could not have had any material weight with the jury even had they been disposed to violate the court's admonition. The evidence before us would have compelled the conviction of the defendant had the objectionable remark not been made. Neither do we think that appellant can bring the remark of the district attorney within the second exception; that is, that the statement was so inherently prejudicial to defendant's rights that the harmful results therefrom were not obviated and cured by the court's admonition. A remark quite similar to that of the district attorney's in this case, and to which the defendant made objection, was the subject of consideration in the case of *People* v. *Plum*, 88 Cal. App. 575, 584 [263 Pac. 862, 265 Pac. 322], and it was held by the appellate court that such a remark, and the refusal of the court to sustain defendant's objection thereto, were not prejudicial to the defendant's rights. Defendant contends that the remark was in the nature of a threat, and was therefore highly prejudicial to his rights, citing *People* v. *Warr*, 22 Cal. App. 663 [136 Pac. 304]. There is nothing to be found in the opinion in that case which sustains this contention of the defendant. The following statement from the opinion is adverse to defendant's position where the court said: "It very seldom happens that a mere observation of an attorney, expressed during the heat of his oration, fastens itself with such tenacity upon the minds of the jurymen as not to be dislodged by a direct instruction from the trial judge."

After both sides had rested, but before the argument to the jury had commenced, the prosecution asked that the case be reopened for the purpose of permitting the introduction in evidence of a bottle, which had been previously marked exhibit 5 for identification, but which had not been offered in evidence. The request of the district attorney was granted, and the bottle was admitted in evidence as exhibit 5. This was done over the objection of the defendant. The bottle was found in the deceased's automobile, and the evidence showed that it bore the finger-prints of the defendant. The matter of reopening a case to take further evidence is within the sound

discretion of the trial court. (*People* v. *Oxnam,* 170 Cal. 211, 214 [149 Pac. 165] ; *People* v. *Champion,* 193 Cal. 441, 447 [225 Pac. 278].) No claim is made that the bottle, exhibit 5, was not material in the case or that it had not been properly identified by competent evidence during the progress of the trial. There was no error in permitting the case to be opened for the purpose of admitting this exhibit in evidence. Even if there was error, it was harmless as it was already in evidence that the bottle had been found in deceased's car shortly after his death and that it bore the finger-prints of the defendant. The mere admission of the bottle itself in evidence could not have prejudiced the defendant in the eyes of the jury after it had heard the evidence relative to the place where it was found and that the finger-prints of the defendant were found on the bottle. This is particularly evident when we consider that the only value of the bottle as evidence was that it bore the defendant's finger-prints and that the only purpose of having the bottle admitted in evidence was that it might be submitted to the inspection of the members of the jury, who, of course, were unable to discover the finger-prints thereon which the experts in the case testified were on the bottle.

 Finally, the appellant states that in view of the errors occurring during the trial, which have just been considered by us, and also in view of the excited and inflamed state of the public mind due to this and similar crimes committed in the county in which the defendant was tried, this court should take the necessary steps to bring about a commutation of defendant's sentence to life imprisonment. The power and authority to fix the punishment for murder of the first degree has been by legislative enactment committed to the exclusive discretion of the jury trying the case. This court has no authority to review such discretion. (*People* v. *Adams,* 199 Cal. 361, 366 [249 Pac. 186] ; *People* v. *Vukich,* 201 Cal. 290, 298 [257 Pac. 46] ; *People* v. *Superior Court,* 202 Cal. 165, 169 [259 Pac. 943].)

The judgment and order denying motion for a new trial are affirmed.

Langdon, J., Waste, C. J., Shenk, J., Seawell, J., and Conrey, J., concurred.