[Crim. No. 7753. First Dist., Div. Four. May 29, 1970.]

THE PEOPLE, Plaintiff and Respondent, v.
HUEY P. NEWTON, Defendant and Appellant.

**COUNSEL**

Garry, Dreyfus, McTernan & Brotsky, Charles R. Garry, Benjamin Dreyfus and Fay Stender for Defendant and Appellant.

Thomas C. Lynch, Attorney General, Albert W. Harris, Jr., Assistant Attorney General, Robert R. Granucci and Clifford K. Thompson, Jr., Deputy Attorneys General, for Plaintiff and Respondent.

## OPINION

**RATTIGAN, J.**—Huey P. Newton appeals from a judgment convicting him of voluntary manslaughter.

Count One of an indictment issued by the Alameda County Grand Jury in November 1967, charged defendant with the murder (Pen. Code, § 187) of John Frey; count Two, with assault with a deadly weapon upon the person of Herbert Heanes, knowing or having reasonable cause to know Heanes to be a peace officer engaged in the performance of his duties (Pen. Code, § 245b); count Three, with the kidnaping of Dell Ross. (Pen. Code, § 207.) The indictment also alleged that defendant had previously (in 1964) been convicted of assault with a deadly weapon, a felony. He pleaded not guilty to all three counts and denied the prior.

After the People rested during the lengthy jury trial which followed in 1968, and pursuant to Penal Code section 1118.1, the trial court granted defendant's motion for acquittal on count Three (the Ross kidnaping). Similar motions, addressed to the other counts, were denied. The jury acquitted him of the Heanes assault charged in count Two, but found him guilty of the voluntary manslaughter of Frey under count One. The jury also found the charge of the prior felony conviction to be true. Defendant's motions for new trial and for probation were denied, and he was sentenced to state prison for the term prescribed by law. This appeal followed.

At relevant times, John Frey and Herbert Heanes were officers of the Oakland Police Department. The criminal charges against defendant arose from a street altercation in which Frey was fatally wounded by gunfire, and Heanes and defendant were shot, on October 28, 1967. Through the testimony of Oakland police radio dispatcher Clarence Lord, and a tape recording of the radio transmissions mentioned therein, the People showed that the following events first occurred on the date in question:

Lord was on radio duty in the Oakland Police Administration Building. Officer Frey was also on duty, and alone in a police car, patrolling an assigned beat in Oakland. At about 4:51 a.m., he radioed Lord and requested a check on an automobile which was moving in his vicinity and which bore license number AZM 489. Less than a minute later, Lord told

Frey that "we have got some PIN information coming out on that."[1] Frey replied, "Check. It's a known Black Panther vehicle. . . . I am going to stop it at Seventh and Willow [Streets]. You might send a unit by." ("Check," in this context, meant that Frey had received Lord's message.) Officer Heanes, who was listening to this conversation in his police car on another beat, called in that he was "enroute" to Seventh and Willow Streets. This transmission terminated at about 4:52 a.m.

A few minutes later Frey asked Lord by radio, "you got any information on this guy yet?" Explaining this call, Lord testified that "when I gave him [Frey] the information there was PIN information he made the car stop on the strength of that, on the strength of the PIN information. He [now] wants to know what information I have that told him to stop the vehicle." Lord gave Frey the name "LaVerne Williams" and asked him "if there were a LaVerne Williams in the vehicle." Frey replied in the affirmative. Lord told him there were a "couple" of warrants issued to LaVerne Williams, for parking violations, on the identified vehicle.

Lord testified that under such circumstances "[w]e check and see if the warrants are still outstanding, first of all, and if they are, and then they [the officers outside] can ascertain if they have that person stopped on the street, then they take action concerning the warrant." Pursuing this procedure in the radio conversation, he gave Frey an address for "LaVerne Williams" and said "Let me know if this is the same address or not." Frey asked Lord, "What's his description?" Lord replied ". . . I don't have the description. Do you have a birth date on him there? We're checking him out right now downstairs."

After another brief interval, and just before 5 a.m., this further exchange occurred by radio: "FREY: 1A, it's the same address. He has on his registration 1114 - 12th Street? RADIO [Lord]: Check. What's his birth date? FREY: He gave me some phony. I guess he caught on. RADIO: Okay, check. It's not necessary, anyway. We're checking him out downstairs there. We'll have the information back in a few minutes. FREY: Check. Thanks." The next relevant radio call, received at 5:03 a.m., was a "940B" ("an officer needs assistance immediately") from Officer Heanes at Seventh and Willow Streets.

Officer Heanes testified for the People as follows: He arrived at Seventh and Willow Streets "three to four minutes" after responding by radio to Officer Frey's "cover call." Officer Frey's police car was parked at the south curb of Seventh Street, east of Willow Street and facing east. A

---

[1] "PIN" means "Police Information Network," a computerized system which stores and reports information concerning outstanding warrants associated with identified motor vehicles.

beige Volkswagen was parked directly in front of it, also facing east. Heanes parked his car behind Frey's, alighted and walked to the right rear of the Volkswagen. At this time, two men were seated in the Volkswagen, both in the front seat; Officer Frey was standing near the driver's door of the vehicle, writing a citation. (Heanes made an in-court identification of defendant as the man seated in the driver's seat of the Volkswagen.)

After a minute or so, Heanes followed Frey to the latter's vehicle, where he heard Frey talk to the police radio dispatcher about an address and a birth date. When Frey finished the radio call, he and Heanes had a conversation in which Frey indicated that defendant, when asked for identification, had produced the Volkswagen registration and given his name as "LaVerne Williams." While Frey remained in his car, Heanes walked forward to the Volkswagen, addressed defendant as "Mr. Williams," and asked if he had any further identification. Defendant, still seated in the vehicle, said "I am Huey Newton." Frey then approached the Volkswagen and conversed with Heanes, who asked defendant to get out of the car. Defendant asked "if there was any particular reason why he should." Heanes asked him "if there was any reason why he didn't want to." Frey then informed defendant that he was under arrest and ordered him out of the car.

Defendant got out of the Volkswagen and walked, "rather briskly" and in a westerly direction, to the rear of the police cars. Frey followed, three or four feet behind defendant and slightly to his (defendant's) right. Heanes followed them, but stopped at the front end of Frey's police car (the second car in line). Defendant walked to the "rear part" of Heanes's car (third in line), Frey still behind him, and turned around. He assumed a stance with his feet apart, knees flexed, both "arms down" at hip level in front of his body.

Heanes heard a gunshot and saw Officer Frey move toward defendant. As he (Heanes) drew and raised his own gun in his right hand, a bullet struck his right forearm. He grabbed his arm "momentarily" and noticed, from the corner of his eye, a man standing on the curb between the Volkswagen and Officer Frey's police car. Heanes turned and aimed his gun at the man (whom he apparently identified at the time as defendant's passenger, although he had not seen the passenger get out of the Volkswagen). The man "raised his hands and stated to me he wasn't armed, and he had no intentions of harming me." To the best of Heanes' knowledge, the man's hands were empty.

Heanes returned his attention to Officer Frey and defendant, who were "on the trunk lid of my car [the third car in line] tussling." The two were in "actual physical contact" and "seemed to be wrestling all over the trunk

area of my car." He next remembered being on his knees at the front door of Frey's (the second) car, approximately "30, 35 feet" from the other two men. Defendant was then facing him; Officer Frey was "facing from the side" of defendant, toward the curb, and appeared to be "hanging onto" him. Holding his gun in his left hand, Heanes aimed at defendant and fired "at his midsection." Defendant did not fall; Heanes saw no one fall at any time. He (Heanes) then heard "other gunshots . . . from the area of where Officer Frey and . . . [defendant] . . . were tussling on the rear part of my car."[2] Heanes did not see a gun in defendant's hand at any time. He next remembered "laying" in Officer Frey's police car, and calling an "emergency 940B" on its radio. After that, and through the vehicle's rear window, he saw two men running in a westerly direction toward Seventh and Willow Streets.

Henry Grier, a bus driver employed by AC Transit, gave this testimony for the People: Driving his empty bus westbound on Seventh Street at about 4:58 a.m. on October 28, 1967, he saw the three vehicles parked at the south curb, "about bumper to bumper," west of Willow Street. "Red lights" were flashing on the police cars. He also saw two uniformed police officers and two "civilians" standing together in the street, to his left and next to the Volkswagen. He continued west on Seventh Street to a turn-around point two blocks west of Willow Street, turned without stopping, returned on Seventh Street in an eastbound direction, and stopped to pick up two bus passengers at Willow Street.

Continuing east on Seventh Street, Grier again came upon the three parked vehicles. This was four to five minutes after he passed them while headed west. He saw the same flashing lights on the police cars, and three men in the street. Two of them, a police officer and a "civilian," were walking toward the bus. When Grier first saw them, they were 20-25 feet distant from him and a point between the Volkswagen and the first police car parked behind it. The officer was walking a "pace" behind the civilian, and was apparently holding him "sort of tugged under the arm." The third man in the street was another police officer, who was walking in the same direction about "ten paces" behind the first officer and the civilian.

[2]Although Officer Heanes' testimony was clear to the effect that he heard the first shot, and was struck in the arm, before anything else happened. it was ambiguous as to the sequence in which the subsequent shots were fired. His first account, on direct examination, indicated that he fired at defendant's "midsection," and from a kneeling position, before he heard the "other gunshots" mentioned. His later testimony to the same events, under cross-examination and upon redirect, suggested that he heard the "other gunshots" before he fell to his knees and fired at defendant. As will appear, he fired another shot, and was himself shot again twice, during the episode described. He did not remember these events. and testified that he "blacked out," and had a "lapse of memory," after he was shot in the arm.

(Grier did not then, or again, see the other "civilan" he had noticed when driving west on Seventh Street.)

As the first pair drew closer to the bus, which was still "rolling," the civilian pulled a gun from inside his shirt and "spun around." The first police officer "grabbed him by the arm." The two struggled, and "the gun went off." The officer walking behind them "was hit and he fell"; after he was hit, he drew his gun and fired. Grier stopped the bus immediately and called "central dispatch" on its radio. At this point, the first officer and the civilian were struggling near the front door of the bus and within a few feet of Grier. He saw the civilian, standing "sort of in a crouched position," fire several shots into the first officer as the latter was falling forward.[3] These shots were fired from, or within, a distance of "four or five feet" from the midsection of the officer's body; the last one was fired "in the direction of his back" as he lay, face down, on the ground. While these shots were being fired, Grier was saying on the bus radio, "Get help, a police officer is being shot. Shots are flying everywhere; get help. Help, quick." After firing the last shot at the fallen officer, the civilian "went diagonally across Seventh [Street]." At the trial, Grier positively identified defendant as the "civilian" mentioned in his account of the shootings.

Gilbert DeHoyos and Thomas Fitzmaurice, both Oakland police officers, testified for the People as follows: Shortly after 5 a.m. on October 28, 1967, both responded to Officer Heanes' "940B" call for assistance. Officer DeHoyos arrived at Seventh and Willow Streets less than a minute later; Officer Fitzmaurice arrived just behind him. They found Officer Frey lying on the street near the rear of Heanes' police car, still alive, and Heanes in the front seat of Frey's car. They saw no other persons nearby. Officer Heanes told Fitzmaurice that "his leg hurt and his arm and that Huey Newton had done it . . . he told me he had fired [at defendant] and I think he hit him . . . he [Heanes] thought he hit him."

Defendant arrived at the emergency desk of Kaiser Hospital at 5:50 a.m. on the same morning. He asked to see a doctor, stating "I have been shot in the stomach." A nurse called the police. Officer Robert Fredericks arrived and placed defendant under arrest. He (defendant) had a bullet wound in his abdomen. The bullet had entered in the front and exited through the back of his body.

Officers Frey and Heanes were taken to Merritt Hospital, where Frey was dead on arrival. He had been shot five times, at approximately the same time but in an unknown order. One bullet entered in the front, and

---

[3] Grier expressly testified to the sequence of shots stated here: i.e., that "the gun went off" the first time; the second officer "was hit and he fell," and fired his own gun; and the civilian thereafter fired "several shots" at the first officer.

exited through the back, of his left shoulder; another passed through his left thigh, also from front to back. A third (the only one recovered from Frey's body) entered the midback and lodged near the left hip. A fourth creased the left elbow. Another bullet entered the back, traversed the lungs, and exited through the right shoulder in front: this wound caused Officer Frey's death within 10 minutes. Officer Heanes had three bullet wounds: one in his right arm, one in the left knee, one in the chest.

Three slugs were recovered: one from Officer Frey's hip, one from Heanes' left knee, and a third which had been lodged in the right front door of the Volkswagen. In addition, two 9-mm. Luger shell casings were found at the scene. One was in the street between the two police cars, the other near the left front bumper of Heanes' car and approximately where Frey was lying. The 9-mm. bullets had been fired from an automatic (Officers Frey and Heanes carried .38-caliber Smith & Wesson revolvers). A live 9-mm. Luger cartridge was found on the floor of the Volkswagen, between the two front seats. Only Officer Heanes' gun was found; he was holding it when the other officers arrived at the scene. Two rounds had been expended from the gun. Neither a Luger nor Officer Frey's revolver was found.

Oakland Police Department Officer John Davis testified for the People as follows: Two types of gunpowder, ball and flake, were involved in the shootings. Officer Frey's gunbelt contained high velocity cartridges with ball powder. Officer Heanes' gun used flake powder cartridges; the 9-mm. cartridges also contained flake powder. The three slugs recovered from Officer Frey's body, Heanes' knee and the Volkswagen door were .38-caliber specials fired with ball powder, similar to the cartridges in Officer Frey's gunbelt. The slugs found in both officers' bodies were fired from the same .38-caliber Smith & Wesson revolver, the type of weapon normally carried by Officer Frey; neither had been fired from Heanes' gun, which was of the same type.

Davis testified that a gunshot fired into a body from close range (up to "five, six feet," and with variations) will leave powder deposits at the point of impact; a gun firing a high velocity, ball powder bullet would have to be fired from a distance of more than six feet to leave no such deposits. Among several bullet-entry holes in Officer Frey's clothing, three (one in the left thigh and two in the back) were surrounded by ball powder deposits. Davis estimated that these shots were fired at the victim from distances of 12-24 inches, 12 inches and 6-12 inches. The other two entry holes in Frey's clothing (in the shoulder and elbow area) showed no powder deposits, and none appeared at the bullet-entry holes in the clothing worn by Officer Heanes and defendant.

*Defense Evidence*

Tommy Miller gave this testimony for the defense: He boarded an east-bound bus at Seventh and Willow Streets at about 5 a.m. on October 28, 1967. As the bus moved away from the stop, and the driver was making change for him and another passenger, he saw "red lights and police cars" on Seventh Street, and police officers and another man in the street; one of the officers "had him [the man] up against the car." The witness could identify no faces; it was "too dark," and the persons in the street were facing away from him. Hearing "a lot of gunfire," he laid down in the rear of the bus. When the shooting stopped, he got up and saw, from the back of the bus (which had stopped), a police officer lying on the ground.

Gene McKinney, who was also called by the defense, testified 'that he was defendant's passenger in the Volkswagen at Seventh and Willow Streets. He thereafter pleaded self-incrimination as to any and all subsequent questions, was held in contempt by the trial court, and gave no further testimony.

Defendant, testifying in his own behalf, denied killing Officer Frey, shooting Officer Heanes, or carrying a gun on the morning of the shootings. His account of the episode was as follows: He was driving with Gene McKinney on Willow Street, and had just turned into Seventh Street when he noticed a red light through the rear window of the Volkswagen. He pulled over to the curb and stopped. Officer Frey approached the Volkswagen and said "Well, well, well, what do we have? The great, great Huey P. Newton." Frey asked for defendant's driver's license and inquired as to the ownership of the Volkswagen. Defendant handed him his (defendant's) license, and the vehicle registration, and said that the car belonged to LaVerne Williams. Officer Frey returned the license and walked back to his patrol car with the registration.

A few minutes later Officer Heanes arrived, conversed with Frey, then walked up to the Volkswagen and asked, "Mr. Williams, do you have any further identification?" Defendant said, "What do you mean, Mr. Williams? My name is Huey P. Newton . . ." Heanes replied, "Yes, I know who you are." Officer Frey then ordered defendant out of the car. He got out, taking with him a criminal law book in his right hand. He asked if he was under arrest; Officer Frey said no, but ordered defendant to lean against the car. Frey then searched him, placing his hands inside defendant's trousers and touching his genitals. (Officer Heanes had testified that defendant was not searched at any time.) McKinney, who had also alighted from the Volkswagen, was then standing with Officer Heanes on the street side of the Volkswagen.

Seizing defendant's left arm with his right hand, Officer Frey told him to go back to his patrol car. Defendant walked, with the officer "kind of pushing" him, past the first police car to the back door of the second one. Defendant opened his book[4] and said, "You have no reasonable cause to arrest me." The officer said, "You can take that book and stick it up your ass, Nigger." He then struck defendant in the face, dazing him. Defendant stumbled backwards and fell to one knee. Officer Frey drew a revolver. Defendant felt a "sensation like . . . boiling hot soup had been spilled on my stomach," and heard an "explosion," then a "volley of shots." He remembered "crawling . . . a moving sensation," but nothing else until he found himself at the entrance of Kaiser Hospital with no knowledge of how he arrived there. He expressly testified that he was "unconscious or semiconscious" during this interval, that he was "still only semiconscious" at the hospital entrance, and that—after recalling some events at Kaiser Hospital—he later "regained consciousness" at another hospital.

The defense called Bernard Diamond, M.D., who testified that defendant's recollections were "compatible" with the gunshot wound he had received; and that "[a] gunshot wound which penetrates in a body cavity, the abdominal cavity or the thoracic cavity is very likely to produce a profound reflex shock reaction, that is quite different than a gunshot wound which penetrates only skin and muscle and it is not at all uncommon for a person shot in the abdomen to lose consciousness and go into this reflex shock condition for short periods of time up to half an hour or so."

### The Instructions Upon Unconsciousness

Defendant asserts prejudicial error in the trial court's failure to instruct the jury on the subject of *unconsciousness* as a defense to a charge of criminal homicide. As the record shows—and the Attorney General emphasizes—that defendant's original request for instructions on this subject was "withdrawn," we first recount the sequence in which this occurred. During the trial, defense counsel submitted to the court a formal list requesting—by number only—specified CALJIC instructions pertaining, among other things, to self-defense (322 and 322-A), unconsciousness (71-C and 71-D), diminished capacity and manslaughter.[5] At the suggestion of all counsel, the court announced that ". . . [A]rgument and discussion concerning

---

[4] A criminal lawbook, with defendant's name inscribed inside, was found in a pool of blood near Officer Frey.

[5] On diminished capacity, defendant requested CALJIC 73-B (Revised) and 305.1 (New); on manslaughter, CALJIC 305-AA (New), 308 (Revised), 308-A (Revised), 310 (Revised), 311 and 311-B. This cause was tried before the publication (in 1970) of the current (third) edition of CALJIC; the work cited at the trial was the revised (1966) edition of CALJIC (California Jury Instructions—Criminal) as supplemented through its 1967 cumulative pocket part.

the proposed instruction will be had in chambers and when we get through . . . we will come out and place on the record the rulings of the Court . . . [on the instructions proposed by both sides] . . ." The conference in chambers, which followed, was not reported (although it apparently lasted for several hours). At the opening of the next trial day, this exchange occurred between the court and defense counsel:

"THE COURT: Gentlemen, in connection with the instructions, in discussion in chambers the attorneys for the defendant have withdrawn their request for Instruction No. 322, 322A, of CALJIC, being instructions in self-defense. Is that correct, Mr. Garry?

"MR. GARRY [defense counsel]: That is correct.

"THE COURT: Mr. Newton, you understand that? Meet with your approval?

"THE DEFENDANT: Yes, it does.

"THE COURT: Now, the attorneys for the defendant have requested that the Court give *either* 71C and 71D, *or* give 73B of CALJIC. Now, is that correct?

"MR. GARRY: That is correct.

"THE COURT: Very well. The Court will give 73B, and *at the request of the defendant will not give* 71C and 71D. Does that meet with your approval, Mr. Garry?

"MR. GARRY: Yes, Your Honor.

"THE COURT: Mr. Newton, that has been explained to you and it meets with your approval?

"THE DEFENDANT: Yes." (Italics added.)

The trial court then enumerated, with some intermittent discussion, the CALJIC and other instructions which be given. This exchange followed:

"MR. GARRY: Let the record show that the instructions that have been requested by the defendant that are not being given, of course, will be stated as an objection on our part.

"THE COURT: Well, with the exception, of course, of those which have— 322 and 322A—which you have withdrawn, 71C and 71D which, in effect, you have withdrawn, because we are giving 73B—

"MR. GARRY: Yes, Your Honor.

"THE COURT: Those are the only ones. All the other instructions, yes,

I have gone through all of them and they are either not given or else they are covered by other instructions given, and I will make a note, of course, on each instruction . . . and file that. You know now what instructions the Court plans to give. . . ."[6]

Thereafter the trial court fully and correctly instructed the jury on murder in the first degree (including the requisite elements of willfulness, deliberation, premeditation and malice aforethought) and in the second (including the element of malice aforethought). At defendant's request, the court also gave instructions on voluntary manslaughter[7] and diminished capacity.[8] Pursuant to the judge's intentions as announced in the dialog quoted above, the instructions originally requested by defendant on self-defense (CALJIC 322 and 322-A) and unconsciousness (71-C and 71-D) were not given; the jury was instructed on neither subject.

Although the evidence of the fatal affray is both conflicting and confused as to who shot whom and when, some of it supported the inference that defendant had been shot in the abdomen before he fired any shots himself.[9]

---

[6]Defendant's formal list requested 31 CALJIC instructions, referring to each by its number only. According to the trial court's "note" later written by the entries requesting CALJIC 322 and 322-A (on self-defense), and 71-C and 71-D (on unconsciousness), each of these requests was shown to have been "Withdrawn."

[7]CALJIC 308-A (Rev.) ("Voluntary manslaughter is the intentional and unlawful killing of a human being without malice aforethought upon a sudden quarrel or heat of passion without deliberation or premeditation"), 311 (concerning "provocation" and "heat of passion"), 305-AA (New) and 311-B.

[8]The court gave the two CALJIC instructions requested by defendant on this subject: "When a defendant is charged with a crime which requires that a certain specific intent or mental state be established in order to constitute the crime or degree of crime, you must take all the evidence into consideration and determine therefrom if, at the time when the crime allegedly was committed, the defendant was suffering from some abnormal mental or physical condition, however caused, which prevented him from forming the specific intent or mental state essential to constitute the crime or degree of crime with which he is charged" (CALJIC 73-B [Rev.]); and

"If you find from the evidence that at the time the alleged crime was committed, the defendant had substantially reduced mental capacity, whether caused by mental illness, intoxication or any other cause, you must consider what effect, if any, this diminished capacity had on the defendant's ability to form any of the specific mental states that are essential elements of murder. Thus, if you find that the defendant's mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, premeditate, deliberate, or form an intent to kill, you cannot convict him of a wilful, deliberate and premeditated murder of the first degree. Also, if you find that his mental capacity was so diminished that he did not, or you have a reasonable doubt whether he did, harbor malice aforethought, as it has been defined for you, you cannot find him guilty of murder of either the first or second degree." (CALJIC 305.1 [New].)

(We mention in passing that there was no evidence that defendant was mentally ill or intoxicated at the time of the shootings.)

[9]Defendant's testimony suggested that Officer Frey wounded him with the first shot fired. However, the absence of powder deposits on his (defendant's) clothing would indicate that Officer Heanes, not Frey, shot him. Grier's testimony was explicit as to

Given this sequence, defendant's testimony of his sensations when shot—supplemented to a degree, as it was, by Dr. Diamond's opinion based upon the nature of the abdominal wound—supported the further inference that defendant was in a state of unconsciousness when Officer Frey was shot.

■ Where not self-induced, as by voluntary intoxication or the equivalent (of which there is no evidence here, as we pointed out in fn. 8, *ante*), unconsciousness is a complete defense to a charge of criminal homicide. (Pen. Code, § 26, subd. Five; *People* v. *Graham* (1969) 71 Cal.2d 303, 316-317 [78 Cal.Rptr. 217, 455 P.2d 153]; *People* v. *Wilson* (1967) 66 Cal.2d 749, 760-762 [59 Cal.Rptr. 156, 427 P.2d 820].) "Unconsciousness," as the term is used in the rule just cited, need not reach the physical dimensions commonly associated with the term (coma, inertia, incapability of locomotion or manual action, and so on); it can exist—and the above-stated rule can apply—where the subject physically acts in fact but is not, at the time, conscious of acting.[10] The statute underlying the rule makes this clear,[11] as does one of the unconsciousness instructions originally requested by defendant.[12] (See also *People* v. *Roerman* (1961) 189 Cal.App.2d 150, 160-163 [10 Cal.Rptr. 870] and cases cited.) Thus, the rule has been invoked in many cases where the actor fired multiple gunshots while inferably in a state of such "unconsciousness" (e.g., *People* v. *Coogler* (1969) 71 Cal.2d 153, 157-159, 161-166, 169 [77 Cal.Rptr. 790, 454 P.2d 686]; *People* v. *Wilson, supra,* at pp. 752-753, 755-756, 761-763; *People* v. *Bridgehouse* (1956) 47 Cal.2d 406, 409-411, 414 [303 P.2d 1018]; *People* v. *Moore* (1970) 5 Cal.App.3d 486, 488-490, 492 [85 Cal.Rptr. 194]; *People* v. *Edgmon* (1968) 267 Cal.App.2d 759, 762-763, 764 [fn. 5], [73 Cal.Rptr. 634]; *People* v. *Cox* (1944) 67 Cal.App.2d 166, 169-173 [153 P.2d 362]), including some in which the only evidence of "unconsciousness" was the actor's own testimony that he did not recall the shooting.

---

this sequence: i.e., that Heanes, struck by the first bullet fired, shot at defendant before the latter commenced firing at Frey. (See text at fn. 3, *ante*.) Heanes' account, while less precise on this subject (see text at fn. 2, *ante*) also supports the inference that he shot defendant (in the "midsection") before Officer Frey was shot by anyone.

[10]As was true of Officer Heanes, according to his testimony (see fn. 2, *ante*), during part of the shooting episode in the present case.

[11]Penal Code section 26 provides in pertinent part that "All persons are capable of committing crimes except those belonging to the following classes: . . . Five-Persons who *committed the act charged without being conscious thereof.*" (Italics added.)

[12]CALJIC 71-C, which read in pertinent part as follows: "Where a person *commits an act without being conscious thereof,* such act is not criminal even though, if committed by a person who was conscious, it would be a crime . . . ." (Italics added.)

(E.g., *People* v. *Wilson, supra,* at pp. 755-756, 762; *People* v. *Bridgehouse, supra,* at pp. 409-411.)

█ Where evidence of involuntary unconsciousness has been produced in a homicide prosecution, the refusal of a requested instruction on the subject, and its effect as a complete defense if found to have existed, is prejudicial error. (*People* v. *Wilson, supra,* 66 Cal.2d 749 at p. 764; *People* v. *Bridgehouse, supra,* 47 Cal.2d 406 at p. 414. See *People* v. *Mosher* (1969) 1 Cal.3d 379, 391 [82 Cal.Rptr. 379, 461 P.2d 659]; *People* v. *Coogler, supra,* 71 Cal.2d 153 at p. 169.) The fact, if it appears, that such evidence does not inspire belief does not authorize the failure to instruct: "However incredible the testimony of a defendant may be he is entitled to an instruction based upon the hypothesis that it is entirely true." (*People* v. *Modesto* (1963) 59 Cal.2d 722, 729 [31 Cal.Rptr. 225, 382 P.2d 33] [quoting *People* v. *Carmen* (1951) 36 Cal.2d 768, 772-773 (228 P.2d 281)].) █ It follows that the evidence of defendant's unconsciousness in the present case was "deserving of consideration" upon a material issue. (*People* v. *Castillo* (1969) 70 Cal.2d 264, 270 [74 Cal. Rptr. 385, 449 P.2d 449]; *People* v. *Modesto, supra; People* v. *Carmen, supra.*)

Defendant did not request instructions upon unconsciousness; as we have seen, his original request therefor was "withdrawn." █ But a trial court is under a duty to instruct upon diminished capacity, in the absence of a request and upon its own motion, where the evidence so indicates. (*People* v. *Henderson* (1963) 60 Cal.2d 482, 490-491 [35 Cal.Rptr. 77, 386 P.2d 677]; *People* v. *Stines* (1969) 2 Cal.App.3d 970, 977 [82 Cal.Rptr. 850].) █ The difference between the two states—of diminished capacity and unconsciousness—is one of degree only: where the former provides a "partial defense" by negating a specific mental state essential to a particular crime, the latter is a "complete defense" because it negates capacity to commit any crime at all. (See *People* v. *Gorshen* (1959) 51 Cal.2d 716 at p. 727 [336 P.2d 492]; *People* v. *Conley* (1966) 64 Cal.2d 310, 319 [49 Cal.Rptr. 815, 411 P.2d 911].) █ Moreover, evidence of both states is not antithetical; jury instructions on the effect of both will be required where the evidence supports a finding of either. (See *People* v. *Mosher, supra,* 1 Cal.3d 379 at p. 391; *People* v. *Anderson* (1965) 63 Cal.2d 351, 355-356 [46 Cal.Rptr. 863, 406 P.2d 43].) █ We hold, therefore, that the trial court should have given appropriate unconsciousness instructions upon its own motion in the present case, and that its omission to do so was prejudicial error. (See *People* v. *Mosher,*

*supra; People* v. *Coogler, supra,* 71 Cal.2d 153 at p. 169; *People* v. *Moore, supra,* 5 Cal.App.3d 486 at p. 492.)

The error was prejudicial per se because the omission operated to deprive defendant of his "constitutional right to have the jury determine every material issue presented by the evidence." (*People* v. *Mosher, supra,* 1 Cal.3d 379 at p. 391; (*People* v. *Modesto, supra,* 59 Cal.2d 722 at pp. 730-731.) Actual prejudice, moreover, is perceptible in the present case. The voluntary manslaughter verdict indicates the jury's decision that defendant shot Officer Frey, but that the jurors found (1) provocation by the officer or (2) dimished capacity on defendant's part, or both. As defendant alone testified to both events, it appears that the jury believed him as to either or both. But, if they fully believed his testimony with respect to his asserted unconsciousness, they had been given no basis upon which to acquit him if they found it to be true. (See *People* v. *Coogler, supra,* 71 Cal.2d 153 at p. 169; *People* v. *Moore, supra,* 5 Cal.App.3d 486 at p. 492.) Defense counsel, in fact, argued to the jury defendant's, and Dr. Diamond's testimony on this subject. Absent instructions upon the legal effect of unconsciousness as a complete defense, the argument was necessarily limited and essentially ineffective. It further appears that the jury gave some thought at least, to acquitting defendant upon a finding of justifiable homicide.[13] Under these circumstances, it is "reasonably probable" that a result more favorable to him—i.e., a verdict acquitting him of the homicide, based upon unconsciousness as a complete defense—would have been reached if the omitted instruction had been given. (See *People* v. *Watson* (1956) 46 Cal.2d 818, 836 [299 P.2d 243].)

### The Question of Invited Error

As defendant's point on the omission of unconsciousness instructions is thus valid on its merits, the question is whether he is precluded from as-

---

[13]The jurors deliberated for four full days, during which they were twice reinstructed, by request, on murder in both degrees, voluntary manslaughter, provocation, heat of passion, diminished capacity, and assault. On one of these occasions, they apparently asked for instructions on "justifiable homicide," which had not been given in the first instance (and were not given when requested). The actual request—which was apparently in writing—does not appear of record, but the trial judge recalled it at a post-judgment hearing conducted for the purpose of correcting the reporter's transcript. The prosecutor declined to stipulate that the request was made, but stipulated that the judge's recollection thereof "may be put in the record." Since the event recalled stands uncontroverted, the jury's interest in "justifiable homicide" is thus a matter of record.

It also bears mentioning that, during their lengthy deliberations, the jurors asked to see, and were shown, the bullet wounds in defendant's body.

serting it on appeal because his original request for such instructions was "withdrawn." He contends in effect that he withdrew his request for CALJIC 71-C and 71-D only because the trial court forced him to choose between them and a *Wells-Gorshen* instruction on dimished capacity. (*People* v. *Wells* (1949) 33 Cal.2d 330 [202 P.2d 53]; *People* v. *Gorshen, supra,* 51 Cal.2d 716.) The trial court denied this claim when defense counsel asserted it on motion for new trial, nevertheless, the judge's remarks at trial suggest that he (the judge) thought the jury should be given instructions on diminished capacity *or* unconsciousness, but not upon both.[14]

If the trial court entertained this view at the time of its remarks, it was in error: the defenses of diminished capacity and unconsciousness were "entirely separate," and neither incompatible nor mutually exclusive, under the evidence. (See *People* v. *Baker, supra,* 42 Cal.2d 550 at p. 575 [268 P.2d 705]; *People* v. *Mosher, supra,* 1 Cal.3d 379 at p. 391; *People* v. *Anderson, supra,* 63 Cal.2d 351 at p. 356.) In any event, while the deficient record[15] does not clearly substantiate counsel's claim that the trial court forced him to a choice, it does not wholly refute him, either; and it tends to explain the court's failure to instruct upon both defenses, upon its own motion, whether counsel correctly understood the situation or not.

A similar situation occurred, and was considered on appeal in light of the "invited error" concept, in *People* v. *Graham, supra,* 71 Cal.2d 303. In *Graham,* defense counsel had openly consented to the trial court's omission of a proper instruction and giving an erroneous one. (*Id.,* pp. 317-318.) The Supreme Court first posed the question in terms of "whether the trial court's affirmative duty to instruct the jury *on its own motion* on the general principles of law relevant to the issues of the case can be nullified by waiver of defense counsel" (*id.,* pp. 317-318 (italics added)). and cited *People* v. *Phillips* (1966) 64 Cal.2d 574, 580-581 [fn. 4], [51 Cal.Rptr. 225, 414 P.2d 353] to the effect that such "waiver" foreclosed

---

[14]We refer to the court's statements, quoted *supra*, that defense counsel had requested "either" CALJIC 71-C and 71-D (on unconsciousness) "or" 73-B (on diminished capacity); that the court would "give 73B and at the request of the defendant will not give 71C and 71D"; and that defense counsel's objections to omitted instructions did not reach "71C and 71D which, in effect, you have withdrawn, because we are giving 73-B . . ."

[15]The record is deficient, of course, because the conference in chambers was unreported. This was not by stipulation of the parties, so far as appears, and it should not have occurred in this particular—and highly important—instance. (See Code Civ. Proc., § 269.)

complaint on appeal only where "the record indicated a 'deliberate' or 'expressed' *tactical* decision by counsel to forego a particular instruction which the court is otherwise obliged to render to the jury." (*People* v. *Graham, supra,* at p. 318 (italics in the original).)

The *Graham* court went on to hold that "invited error" will not originate, so as to foreclose complaint on appeal, by reason of counsel's neglect or mistake: "[O]nly if counsel expresses a *deliberate tactical purpose* in suggesting, resisting, or acceding to an instruction, do we deem it to nullify the trial court's obligation to instruct in the cause." (*People* v. *Graham, supra,* 71 Cal.2d 303 at p. 319 (italics added).) This rule applies with equal effect in the present case, where defense counsel's asserted "waiver" consisted of failing to press for instructions upon unconsciousness, and the *Graham* court said as much: "This formulation correctly resolves the competing considerations of the underlying policies relevant to the problem. On the one hand, the attorney should exercise control over his case and bear responsibility for tactical decisions reached in the course of his representation. On the other hand, the Legislature has indicated that instructions which affect the substantial rights of a defendant should be subject to review, even though his counsel, through neglect or mistake, has failed to object to them. Indeed, this court has held that a trial judge must on his own motion fully and correctly instruct the jury on general principles of law, *regardless of the failure of defense counsel to offer such instructions or to object to their omission.*" (*Id.,* at pp. 319-320 [italics added].)

The self-defense instructions originally requested by defendant (CAL-JIC 322 and 322-A) were wholly inconsistent with his testimony that he he did not kill Officer Frey or shoot Officer Heanes. Accordingly, we can discern a "deliberate tactical purpose" in his counsel's withdrawing the request for them. Defendant's denial of the shootings, however, went no further than his own conscious recollections as recited in his testimony; the denial was not inconsistent with the hypothesis that he fired a gun while—and not before—he was in a state of "unconsciousness" as such state has previously been defined herein. Against the substantial evidence that it was he who shot Officer Frey, the instructions he requested on diminished capacity afforded him partial defenses at best. As only instructions upon unconsciousness offered a complete defense (*People* v. *Wilson, supra,* 66 Cal.2d 749 at p. 764; *People* v. *Mosher, supra,* 1 Cal.3d 379 at p. 391), his counsel's "withdrawal" of them, or the failure to press for them, is irreconcilable with "deliberate

tactical purpose" on counsel's part. (Cf. *People* v. *Phillips, supra,* 64 Cal. 2d 574 at pp. 580-581 [fn. 4 and cases cited].)

■ The "withdrawal" of the critical instructions—to the extent that the event appears[16]—can perhaps be ascribed to "neglect or mistake" (*People* v. *Graham, supra,* 71 Cal.2d 303 at p. 319), or "ignorance or inadvertence" (*id.,* at p. 320) on the part of defense counsel. Whatever the reason for it, though, no "deliberate tactical purpose" appears and we can conceive of none. Under these circumstances, the "invited error" doctrine does not foreclose defendant from asserting his point on the appeal. (*Id.,* at p. 319.) Since we have sustained the point on its merits, the judgment must be reversed.

We also sustain certain other claims of trial error advanced by defendant on the appeal. As the error in the instructions alone requires reversal, we need assess none of the other errors in terms of prejudicial effect. Some of them warrant discussion although they will not recur; others require it because of the prospect of a retrial. They relate to (1) an extrajudicial statement given to the police by the witness Henry Grier, (2) the grand jury testimony of Dell Ross concerning the kidnaping charged in count Three of the indictment, and (3) defendant's prior felony conviction.

### Grier's Extrajudicial Statement

Henry Grier's eyewitness account of the shooting affray (summarized *supra*) was the only direct trial evidence that defendant was the person who fatally shot Officer Frey; Grier's in-court identification of defendant was positive in this respect. He had given a tape-recorded statement to the Oakland police, on the morning of the shootings and less than two hours afterward. As recited in the written transcript of the October 28 statement, his narrative version of the shooting episode did not materially vary from that given in his trial testimony. In the statement as transcribed, however, he described Officer Frey's assailant as "very short . . . sort of pee-wee type fellow . . . no more [than] five feet" in height, weighing "125 pounds" and wearing a dark shirt and light jacket. Grier testified at the trial that Frey's assailant was of "medium height and build" (consistent with the physical measurements of defendant, who is 5 feet 10 inches tall and weighs 165 pounds) and wore a light shirt and dark jacket. Em-

---

[16]Because the conference in chambers went unreported (see fn. 15, *ante*), the record sheds no real light on this subject; the only relevant events of record are defense counsel's affirmative—and laconic—answers to the trial court's inquiries during the successive dialogs quoted, *supra,* from the trial proceedings. We accord no significance to defendant's similar responses.

phasizing these discrepancies in cross-examining Grier, defense counsel made extensive use of the October 28 transcript to impeach the witness' in-court identification of defendant. Counsel also read the full transcript to the jury. The copy used for these purposes, as made available to the defense by the prosecution at the time of trial, showed the following question put to Grier by the police on the morning of the shootings, and his answer thereto:

"Q" [By the interrogating police officer] About how old was [Officer Frey's assailant]?

"A. I couldn't say because I only had my lights on, I couldn't—I *did* get a clear picture, clear view of his face but—because he had his head kind of down facing the headlights of the coach [Grier's AC Transit bus] and I couldn't get a good look—" (Italics added.)

Arguing to the jury, defense counsel cited the passage of the transcript wherein Grier had said he "couldn't get a good look," but omitted any reference to his statement that he "did get a clear picture, clear view" of the assailant's face. Responding in his closing argument, the prosecutor repeatedly reminded the jury of the latter statement. During its deliberations, the jury asked to see a copy of the transcript. Defense counsel, having mutilated his copy during his jury argument, requested another copy from the prosecution. According to the new copy he received, Grier had said, in the above-quoted context of the October 28 statement, that "I *didn't* get a clear picture, clear view of his face . . . " (Italics added.)

The defense immediately moved to reopen the case so that the jury could be apprised of newly discovered evidence. The court denied the motion. Having then obtained the original October 28 police recording of Grier's statement, the defense again moved to reopen. This time, after hearing a playback of the recording, the court found that Grier had indeed said "didn't" in the context quoted above. The judge again refused to reopen, but stated that some action should be taken to provide the jury with a corrected version of the Grier statement. The court thereupon ordered that a "correction" be made in the written transcript, and that a corrected copy of the document be "sent to the Jury just in an ordinary manner without any comment or instructions." The transcript was sent to the jury with the word "did" corrected to read "didn't," but without explanation or notice of the change.

■ Defendant contends that the trial court abused its discretion in refusing to reopen the case. The Attorney General's only argument is to the effect that defendant cannot now complain because his attorney approved the procedure followed by the trial court in sending the corrected transcript to the jury. Defense counsel did indicate his approval of the pro-

cedure when the trial court proposed it, but this was after defendant's first motion to reopen had been denied and the court had indicated its intention to deny the second. At that point, counsel had the choice of approving the procedure or having no correction sent to the jury at all. Under the circumstances, he cannot be said to have waived the right to challenge the court's denial of his motions to reopen.

The trial court clearly had discretion to order the case reopened (Pen. Code §§ 1093, 1094; *People* v. *Berryman* (1936) 6 Cal.2d 331, 338-339 [57 P.2d 136]; *People* v. *Richardson* (1961) 192 Cal.App.2d 166, 169 [13 Cal.Rptr. 321]), even after the jury deliberations had begun (*People* v. *Christensen* (1890) 85 Cal. 568, 570 [24 P. 888]. See *Stoumen* v. *Munro* (1963) 219 Cal.App.2d 302, 319 [33 Cal.Rptr. 305]; Annot., 87 ALR2d 849, 851 et seq.) Factors to be considered in reviewing the exercise of such discretion include the stage the proceedings had reached when the motion was made (see *People* v. *Carter* (1957) 48 Cal. 2d 737, 757 [312 P.2d 665]), the diligence shown by the moving party in discovering the new evidence (*Fernandez* v. *United States* (9th Cir. 1964) 329 F.2d 899, 903), the prospect that the jury would accord it undue emphasis (*Eason* v. *United States* (9th Cir. 1960) 281 F.2d 818, 821-822, and the significance of the evidence. (*People* v. *Carter, supra,* at p. 755.)

Reopening—and its conceivably attendant consequences in terms of further proof, argument and instructions—would have been inconvenient because of the stage of the proceedings at which defendant moved, but it was neither impossible nor unreasonable. (See *People* v. *Carter, supra,* 48 Cal.2d 737 at p. 757; Witkin, Cal. Criminal Procedure (1963) § 434, pp. 435-436 and cases cited.) Reopening was not precluded by any lack of diligence on the part of the defense,[17] and the trial court could have minimized the possibility that the jury would overemphasize the newly discovered evidence.

Whether the new evidence—i.e., the single word change required and made in the transcript of Grier's pretrial statement—was vital and material is arguable either way. Still, Grier was the only witness who positively identified defendant as Officer Frey's assailant. Whether he "did" or "didn't" see the assailant's face was material, especially in light of the

[17]The Attorney General disputes the fact stated here, but he does so within the broader context of defendant's contention, on the appeal, that the prosecution's conduct in connection with Grier and his pretrial statement amounted to suppression of evidence. Defendant's contention involves the progression and effect of several pretrial motions and orders dealing with defense discovery; it was presented to the trial court, which rejected it; and, having examined it on the appeal, we conclude that no error appears in this regard. In all events, the footnoted statement stands.

discrepancies in his separate descriptions of the person he claimed to have seen shooting Officer Frey. The prosecution had vigorously emphasized the word "did" in defending the credibility of Grier's in-court indentification of defendant. The latter was entitled to have the jury consider the possibility, however remote, that someone other than he (e.g., Gene McKinney, whose role in the shooting episode is obscure, under the evidence, to the point of mystery) had engaged in the fatal scuffle with the officer. The jury had indicated its interest in these matters by requesting a copy of the transcript of Grier's pretrial statement. Under all the circumstances, we conclude that the trial court abused its discretion in denying defendant's motions to reopen the case.

### The Dell Ross Grand Jury Testimony

Before the grand jury which produced the indictment charging defendant, in count Three, with kidnaping Dell Ross on October 28, 1967, Ross testified in pertinent part as follows: Sitting in his parked automobile near Seventh and Willow Streets on that date, he heard several gunshots. Two men (one of them defendant, whom Ross identified to the grand jury from a photograph) entered his car. Defendant ordered him, at gunpoint, to drive the pair to a specified street corner in Oakland. Ross complied. While in his car, both men made several statements, quoted by Ross to the grand jury, which implicated defendant in the shooting episode and were highly damaging to his defense in the present prosecution.

When called by the People as a trial witness, and upon the advice of counsel (who appeared with him) Ross pleaded self-incrimination and refused to answer any questions concerning the morning of October 28, 1967. At the request of the prosecution and pursuant to Penal Code section 1324, the trial court granted him immunity and ordered him to testify. Although Ross continued to refuse upon the ground of self-incrimination, he soon indicated that he did not remember what happened on October 28 or testifying to the grand jury. Upon this basis, the prosecutor showed him a copy of the transcript of his grand jury testimony and asked whether it refreshed his memory. When Ross said that he could not read, and over defense objections, the prosecutor then read all his grand jury testimony to the trial jury.

The trial court instructed the jury that the grand jury testimony, and the defense tape recording, were admitted for impeachment only and not for the truth of the matters asserted in either. Several trial days later, upon motion by the defense, the trial court ordered stricken from the record "the entire testimony of . . . [Dell Ross] . . . , and all questions asked of and answers given by said witness, including papers and record-

ings and all statements heretofore made by any counsel, or by the Court, in connection with said witness"; instructed the jury to disregard such evidence; and entered a verdict of acquittal on the kidnaping charge for the stated reason that "the evidence now before the Court is insufficient to sustain a conviction of such offense."

In light of several considerations (the trial court's order striking the Ross testimony to the grand jury, its admonition to the trial jury to disregard it, its order acquitting defendant of the Ross kidnaping, and the degree of the jury's verdict on the homicide charge), it is questionable whether the reading of the grand jury testimony was prejudicial error. It was, however, error which should not recur if defendant is retried.[18] Because of Ross's inability or refusal to recall his testimony to the grand jury, the defense had no opportunity to cross-examine him concerning that testimony. The reading thereof to the trial jury, consequently, operated to violate defendant's Sixth Amendment right of confrontation. (U. S. Const., 6th Amend.; *Douglas* v. *Alabama* (1964) 380 U.S. 415, 419-420 [13 L.Ed.2d 934, 937-938, 85 S.Ct. 1074]; see *California* v. *Green* (1970) 399 U.S. 149 [26 L.Ed.2d 489, 90 S.Ct. 1930].) Nor can the action be justified as impeachment. A party's right to impeach his own witness (Evid. Code, §§ 785, 780 [subd. (h)], 769, 770) is not available where, as here, the witness has not testified against the impeaching party at all: "there is nothing to counteract," and the prior statement emerges as substantive evidence of the facts asserted in it. (*People* v. *Newson* (1951) 37 Cal.2d 34, 41 [230 P.2d 618].)

---

[18]We have in mind the fact that, while the grand jury testimony of Ross no longer bears upon the kidnaping charge of which defendant was acquitted, it remains relevant to the homicide charge upon which he will presumably be retried.

### The Prior Felony Conviction

As charged in the indictment and found by the jury, defendant was con-·victed of a felony (assault with a deadly weapon) in 1964. He represented himself at the 1964 trial. The conviction was affirmed by this court in an unpublished decision filed in 1965· (*People* v. *Newton* (1965) 1 Crim. 4908 [certified for nonpublication]); the Supreme Court denied defendant's petition for hearing. During jury *voir dire* in the present prosecution, defendant moved to strike the prior conviction from the indictment, and for a protective order forbidding its "mention" at the murder trial, upon the Sixth Amendment ground that his waiver of counsel in the 1964 proceedings had been ineffective. The trial court read into the record the full appellate court decision in which the prior conviction was affirmed in 1965; stated that the appellate court had therein considered all of defendant's·current contentions; and denied his motion without an evidentiary hearing.

 Where a prior conviction is constitutionally invalid because the accused was deprived of his Sixth Amendment right to counsel or did not effectively waive it, utilization of the conviction in a subsequent prosecution to support his guilt, enhance his punishment, or impeach his testimonial credibility, is constitutional error. (*Burgett* v. *Texas* (1967) 389 U.S. 109, 114-116 [19 L.Ed.2d 319, 324-326, 88 S.Ct. 258]; *People* v. *Coffey* (1967) 67 Cal.2d 204, 218-219 [60 Cal.Rptr. 457, 430 P.2d 15].) When he raises the issue in the subsequent prosecution by moving to strike the prior or by denying it (upon constitutional grounds in either instance), the trial court must hold a hearing outside the presence of the jury and make a relevant finding based upon evidence there presented. (*People* v. *Coffey, supra,* at pp. 217-218.) The required hearing must be conducted even if the issue arises during the trial, so long as the objection is asserted before the case is submitted to the jury. (*People* v. *Curtis* (1969) 70 Cal.2d 347, 359-361 [74 Cal.Rptr. 713, 450 P.2d 33].)

The People contend that defendant's motion to strike was invalid on procedural and formal grounds. We need not here set forth the details of the motion as challenged by the Attorney General in this regard; they are intricate, and are unlikely to recur if defendant again mounts a constitutional attack upon the 1964 conviction. It suffices to say that we reject the Attorney General's procedural and formal objections to the motion, and that, fairly read with the declaration by counsel which was filed in support thereof, the motion unmistakably advanced the claim that the 1964 trial court had permitted defendant to represent himself at the assault trial without inquiring into his ability to do so. Recent decisions estab-

lish that such inquiry is required before a waiver of counsel can be accepted by a trial court. (E.g., *People* v. *Carter* (1967) 66 Cal.2d 666, 672 [58 Cal.Rptr. 614, 427 P.2d 214]; *People* v. *Armstrong* (1969) 274 Cal.App. 2d 297, 303 [79 Cal.Rptr. 223].) While defendant's motion and its supporting declaration were drafted inartfully and in obvious haste, they presented a reasonably "clear allegation" by defendant "to the effect that, in the proceedings leading to the prior conviction under attack, he *neither was represented by counsel nor waived the right to be so represented.*" (Original italics.) (*People* v. *Coffey, supra,* 67 Cal.2d 204 at p. 215 [quoting *People* v. *Merriam* (1967) 66 Cal.2d 390, 397 (58 Cal.Rptr. 1, 426 P.2d 161)].)

The People also argue that defendant's Sixth Amendment point, as addressed to the 1964 conviction, was resolved against him on the 1965 appeal. We disagree: the 1965 decision noted that he had waived counsel by insisting upon representing himself at the assault trial, but the point now advanced—that his waiver of counsel was ineffective for lack of an appropriate inquiry by the trial court in 1964—was neither raised nor resolved on the former appeal. ■ As the right to assistance of counsel at the former trial "applies retrospectively without regard to time" (*People* v. *Coffey, supra,* 67 Cal.2d 204 at p. 214) for purposes of the present case, the trial court erred in failing to conduct an evidentiary hearing upon defendant's motion to strike. (*Id.,* at pp. 214-218.)

■ In the motion, defendant also attacked the prior conviction upon the Fifth Amendment ground that the 1964 trial court permitted him to testify (he being unrepresented by counsel) without advising him of his right not to do so. (See *People* v. *Wells* (1968) 261 Cal.App.2d 468, 481 [68 Cal.Rptr. 400]; *People* v. *Glaser* (1965) 238 Cal.App.2d 819, 828-829 [48 Cal.Rptr. 427].) Because of the inadequacy of defendant's showing, on the motion, that he was unaware of his right not to testify at the 1964 trial (see *People* v. *Glaser, supra,* at pp. 832-833), we perceive no error in the trial court's denial of his motion with respect to his Fifth Amendment point. (We do not hold as the law of the case that he is precluded from asserting the point again. The problem may not present itself; a ruling by the trial court on his Sixth Amendment point may render it moot.)

Defendant has made certain other contentions which warrant discussion because of the prospect that his prosecution will continue. First among these are his arguments challenging the validity of his indictment by the grand jury and the manner in which the trial jury was selected. (He raised both questions with pretrial motions, which the trial court denied.)

## The Validity of Defendant's Indictment

■ Contrary to defendant's first several contentions relative to his indictment by the grand jury, we hold as follows: (1) The laws of this state which permit a prosecutor to proceed against an accused by way of either information or grand jury indictment, at the prosecutor's option (Cal. Const., art. I, § 8; Pen. Code, §§ 682, 737), are constitutional. (*People* v. *Flores* (1969) 276 Cal.App.2d 61, 65-66 [81 Cal.Rptr. 197].)
■ (2) Defendant was not, by reason of the grand jury proceedings which produced his indictment, unconstitutionally denied the procedural rights which would have been available to him at a preliminary examination. (*People* v. *Flores, supra.*) ■ (3) The California statutes controlling the selection of grand jurors (Pen. Code, § 894 et seq.) are constitutional. (*Turner* v. *Fouche* (1970) 396 U.S. 346, 353-355 [24 L.Ed.2d 567, 575-576, 90 S.Ct. 532]; *Carter* v. *Jury Commission* (1970) 396 U.S. 320, 329-337 [24 L.Ed.2d 549, 557-561, 90 S.Ct. 518]; *Smith* v. *Texas* (1940) 311 U.S. 128, 130-131 [85 L.Ed. 84, 86-87, 61 S.Ct. 164].)

## Grand Jury Selection

Defendant next contends that the above-cited grand jury selection statutes, as applied in Alameda County, resulted in unconstitutional discrimination against young persons, low income groups and black persons.[19] According to the evidence produced upon his pretrial motion in this regard, the membership of the grand jury which indicted him was drawn from among persons who had been nominated to the grand jury by each of the county's 20 superior court judges. (Pen. Code, § 903.4.) The presiding judge of the superior court (for 1967) testified that he had selected his three nominees from among his personal acquaintances. There was no evidence of the selection practices followed by other judges in connection with the 1967, or any other, grand jury.

■ The constitutional standards controlling the selection of grand jurors are the same as for petit jurors. (*Pierre* v. *Lousiana* (1939) 306 U.S. 354, 362 [83 L.Ed. 757, 762, 59 S.Ct. 536].) ■ They must be selected in a manner which does not systematically exclude, or substantially underrepresent, the members of any identifiable group in the community. (*Whitus* v. *Georgia* (1967) 385 U.S. 545, 548-552 [17 L.Ed.2d 599, 602-605, 87 S.Ct. 643] *Hernandez* v. *Texas* (1954) 347 U.S. 475, 476-478

---

[19]Defendant is a black person.

[98 L.Ed. 866, 869-870, 74 S.Ct. 667]; *People* v. *White* (1954) 43 Cal.2d 740, 749-753 [278 P.2d 9]). ▇ Such "purposeful discrimination," however, "may not be assumed or merely asserted"; it must be proved (*Swain* v. *Alabama* (1965) 380 U.S. 202, 205 [13 L.Ed.2d 759, 764, 85 S.Ct. 824]), and defendant bore the burden of making a prima facie case that it existed here. (*Whitus* v. *Georgia, supra,* at p. 550 [17 L.Ed.2d at pp. 603-604].) He presented to the trial court little or no evidence concerning the racial composition of any Alameda County grand jury or grand jury panel. He showed a breakdown of certain grand jurors according to their occupations, but this does not demonstrate "purposeful discrimination" against poor people or anyone else. (See *Fay* v. *New York* (1947) 332 U.S. 261, 273-277 [91 L.Ed. 2043, 2052-2054, 67 S.Ct. 1613].) There was some evidence to the effect that all or most of the members of the 1967 grand jury (which indicted him) were middle-aged persons; again, however, systematic exclusion of the young is not shown. Defendant having failed to make a prima facie case that the 1967 grand jury was constitutionally infirm in any respect pertaining to its selection, he cannot challenge the validity of the indictment upon the ground asserted.

## *Petit Jury Selection*

Defendant contends that the trial jury panel, and the jury itself, were unconstitutionally selected. While we need not consider his arguments relating to administrative excuses from jury service, challenges for cause, and peremptory challenges, we discuss those points which will be relevant in the event of retrial. The first is addressed to the fact that the names of the prospective trial jurors were drawn from the latest Alameda County voter registration lists, at random but from no other source.

On defendant's pretrial motion attacking the venire, his witnesses testified that the selection of jurors exclusively from voter lists results in underrepresentation of poor persons and black persons on juries, because such people are less likely to be registered voters. According to defendant's statistics, the voter registration rate in the predominantly black-populated areas of West Oakland, South Oakland and South Berkeley (all of which are in Alameda County) is 64.7 percent, whereas the countywide rate is 82 percent. One of his witnesses testified that black persons constitute about 7.5 percent of jury panels when voter registration lists are the sole source of prospective jurors' names. Black persons constitute 12.4 percent of Alameda County's population.

▇ As registration to vote is not a condition of eligibility for jury service in this state (see Code Civ. Proc., §§ 198, 199), the county's discretion to use voter registration lists as the source of jurors is subject to the constitutional requirement that juries must reasonably reflect a cross-

section of the community. (*Smith* v. *Texas, supra,* 311 U.S. 128 at p. 130 [85 L.Ed. 84 at p. 86]; *People* v. *White, supra,* 43 Cal.2d 740 at p. 749.)

While each jury roll or venire need not be a perfect mirror of the community (*Swain* v. *Alabama, supra,* 380 U.S. 202 at p. 208 [13 L.Ed. 2d 759 at p. 766]; *People* v. *White, supra*), any substantial disparity, over a period of time, between a group's percentage thereon and its percentage in the eligible population is prima facie evidence of discrimination, regardless of the source of jurors, and shifts the burden to the prosecution to justify the discrepancy. (*Turner* v. *Fouche, supra,* 396 U.S. 346 at p. 360 [24 L.Ed.2d 567 at p. 579]; *Whitus* v. *Georgia, supra,* 385 U.S. 545 at pp. 550-552 [17 L.Ed.2d 599 at pp. 603-605].) The disparity claimed in the present case, however (7.5 percent versus 12.4 percent) is not so substantial as to produce this result. (*Swain* v. *Alabama, supra,* at pp. 205, 209 [13 L.Ed.2d at pp. 764, 766] (10-15 percent vs. 26 percent). Compare *Turner* v. *Fouche, supra* (37 percent vs. 60 percent); *Sims* v. *Georgia* (1967) 389 U.S. 404, 407 [19 L.Ed.2d 634, 637, 88 S.Ct. 523] (4.7-9.8 percent vs. 24.4 percent); *Whitus* v. *Georgia, supra,* 385 U.S. 545, 550-552 [17 L.Ed.2d 599, 603-605] (7.8-9.1 percent vs. 27.1 percent). See Kuhn, *Jury Discrimination* (1968) 41 So.Cal.L.Rev. 235, 251-257 and data cited *passim.*)

The record does not sustain defendant's contention that black persons were underrepresented on the trial jury panel; of the 160 prospective jurors examined, about 13 percent were black persons.[20] He presented no evidence of the economic status of any of the panel members to support his charge that poor persons were excluded from, or substantially underrepresented on, the panel. On the showing made, we cannot conclude that unconstitutional discrimination, on racial or economic grounds, occurred in the selection of prospective jurors.

We also reject defendant's argument that, because of the nature of the case (involving a fatal altercation between a black defendant and white police officers), he was entitled to have at least one resident of West Oakland (described as a "black ghetto") serve on his trial jury.[21]

"Of course, these premises misconceive the scope of the right to an impartially selected jury assured by the Fourteenth Amendment. That right does not entitle one accused of crime to a jury tailored to the cir-

---

[20]Defendant points out that the number of prospective jurors *examined* does not produce a definitive percentage as stated here, because there were others on the panel; consequently, he argues, the actual percentage of black persons on the full panel cannot be determined. The percentage stated here, however, is the only figure supported by the record he was obligated to make.

[21]One black man, not a resident of West Oakland, served on the jury.

cumstances of the particular case, whether relating to the sex or other condition of the defendant, or to the nature of the charges to be tried. It requires only that the jury be indiscriminately drawn from among those eligible in the community for jury service, untrammelled by any arbitrary and systematic exclusions. (Citation.)" *Hoyt* v. *Florida* (1961) 368 U.S. 57, 59 [7 L.Ed.2d 118, 120-121, 82 S.Ct. 159].)

Certain claims of trial error should also be mentioned. ▮ Contrary to defendant's contention as to each point, we hold as follows: (1) The trial court did not err in instructing the jury on flight and motive. The evidence supported the instructions given, and defendant's proposed modifications of the standard instructions on these subjects were properly refused because they emphasized specific evidence. (*People* v. *Hughes* (1951) 107 Cal.App.2d 487, 494 [237 P.2d 64]; Witkin, Cal. Criminal Procedure, *op. cit., supra,* § 477, pp. 484-485.) (2) Defendant's requested instruction on unlawful detention was also properly refused. ▮ Unlawful detention by a police officer does not justify unlawful resistance thereto. (Pen. Code, § 834a; *People* v. *Curtis* (1969) 70 Cal.2d 347, 352 [74 Cal.Rptr. 713, 450 P.2d 33].)

(3) The trial court did not err in excluding the proffered testimony of defense witnesses Burton, Quinones, Daniels, Harris and Brown. ▮ Burton's testimony, offered to prove past mistreatment of black persons by Officer Frey (a subject upon which the trial court gave the defense considerable latitude), was not probative on that subject and was cumulative to the testimony of other defense witnesses. ▮ Quinones' testimony would have been to the effect that police officers harassed defendant at the hospital after the shootings; that of the other three, that the prosecution had offered to pay for information concerning this case. Neither subject was relevant.

▮ (4) The trial court did not unduly restrict the *voir dire* of prospective jurors concerning their racial attitudes. The record shows that the defense was given full latitude in asking questions pertaining to possible racial bias and their knowledge and viewpoints on such matters as the "Black Panther Party," fair housing, "black power" and various political and other organizations.

Other points raised on the appeal need not be discussed.

The judgment of conviction is reversed.

Devine, P. J., and Christian, J., concurred.

On June 26, 1970, the opinion was modified to read as printed above. Respondent's petition for a hearing by the Supreme Court was denied July 29, 1970. McComb, J., was of the opinion that the petition should be granted.